**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Mary REM, Syma Lichter, and Nathan Hanfling, as executors of the Estate of Henry Rem, Defendants,**

**Gerard Rem, Defendant–Appellant.**

No. 1192, Docket 93–6229.

United States Court of Appeals, Second Circuit.

Argued March 2, 1994.

Decided Oct. 13, 1994.

M. Chinta Gaston, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., S.D.N.Y., Richard W. Mark, Asst. U.S. Atty., on the brief), for plaintiff-appellee.

Judd Burstein, New York City (Kim P. Bonstrom, on the brief), for defendant-appellant.

Before: KEARSE, PIERCE, and LEVAL, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Gerard Rem ("Rem" or "Gerard") appeals from a judgment of the United States District Court for the Southern District of New York, Louis J. Freeh, Judge, awarding plaintiff United States $1,875,-179.41 against him, comprising $550,000.08 in withholding taxes owed by a corporation of which he was an officer, plus interest of $1,325,179.41. The district court granted summary judgment against Rem on the ground that he was a responsible officer of the taxpayer corporation within the meaning

of § 6672 of the Internal Revenue Code, 26 U.S.C. § 6672 (1988). On appeal, Rem contends that summary judgment was inappropriate because there were genuine questions of fact as to his liability, to wit, (a) whether he had sufficient control over the corporation to bring him within the scope of § 6672, and (b) if he was a person within the scope of that section, whether his failure to remit the taxes was willful. He also contends that if he is liable, there are questions to be tried as to the extent of his liability. We agree that there are factual questions to be tried on all three issues, and we therefore vacate the judgment and remand for further proceedings.

## I. BACKGROUND

The present suit arises out of the failure of Princeton Industries, Inc. ("Princeton"), to remit to the Internal Revenue Service ("IRS") funds that Princeton withheld from its employees' paychecks with respect to the employees' federal income and social security tax obligations (collectively "withholding taxes"). See 26 U.S.C. § 3402 (1988) (requiring withholding of income tax); id. § 3102 (1988) (requiring withholding of tax imposed by Federal Insurance Contributions Act ("FICA")). IRS contends that Princeton failed to pay withholding taxes for all of 1980 and for parts of 1978, 1979, and 1981. The events, largely as described by Rem in affidavits and deposition testimony, are set out below.

### A. *Princeton's Organization and Operations*

Princeton was founded in 1976 by Rem's father Henry Rem ("Henry") to engage in the manufacture and sale of textiles. Until April 1980, the company had two manufacturing sites—a knitting facility in Ware, Massachusetts, and a dyeing and finishing plant in St. Johnsville, New York. It had a corporate office in New York City, from which the company's managers coordinated production and sales.

The original officers and directors of the company were Henry as chairman, William Thal as president, and Richard Rem ("Richard"), Rem's brother, as executive vice president. Henry had provided Princeton with its starting capital; until 1978 he retained final authority over all business decisions. However, because of his history of credit difficulties, he avoided direct participation in Princeton's credit negotiations.

The company grew quickly, and it continually experienced cash-flow problems. In late 1978, Mary Rem ("Mary"), who was Henry's wife and Rem's mother, invested approximately $600,000 in the company. Shortly thereafter, Mary became the chairman of Princeton's board of directors. Though Henry nonetheless maintained control of the company's affairs for a time, he was soon diagnosed with cancer and transferred both his 80% stock ownership and his control of the company to Mary. Because she was known as Henry's wife, Mary, like Henry, did not attempt to conduct any credit negotiations.

Rem joined Princeton in late 1977, at the suggestion of Richard, "as a consultant to computerize Princeton's rapidly growing operations." (Affidavit of Richard Rem dated March 12, 1992 ("Richard Rem Aff."), ¶ 3.) Rem held an advanced degree in computer operations and had worked for several years as a management consultant for banking and accounting firms; he had no background in the manufacturing business. Rem eventually purchased 20% of the company's stock, with his father retaining the other 80%. Sometime after joining Princeton as a computer specialist, Rem was also assigned responsibility for conducting credit negotiations on behalf of the company.

From 1977 to 1981, Rem had a variety of corporate titles at Princeton. He was corporate secretary from 1977 or 1978 until the company ceased operation in 1981. He became a director of the corporation in 1978 and for some period of time was its treasurer. In addition, with the approval of the board of directors, Rem represented to various actual and potential creditors that he was Princeton's president; he also signed at least one credit agreement as Princeton's "President and Secretary," and signed Princeton's eventual bankruptcy petition as "President."

Both Thal and Richard left Princeton's employ in 1978. After Richard left, Rem's

responsibilities were expanded and included keeping the accountant "appraised [*sic*] on what was happening with the company [and] where the sales were going" (Deposition of Gerard Rem, March 26, 1991 ("Rem Dep."), at 24), negotiating contracts for machinery, computers, and insurance, and attempting to "coordinate and resolve problems" among various employees (*id.* at 44).

In April 1980, a fire destroyed Princeton's Ware manufacturing facility and much of the company's inventory. Delay in payment of Princeton's insurance claim exacerbated its chronic cash-flow problem, and Princeton decided to pay only newly incurred debts, planning to pay older debts, including those to IRS, out of the expected fire insurance reimbursement. When the insurance company eventually made an advance payment in December 1980, however, IRS received no portion of it; rather that money was paid "to banks and finance companies that held liens on the machinery and equipment of the company. The company itself did not receive any money." (Rem Dep. at 57.)

In the meantime, in November 1980, Princeton filed for protection under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* (1988). The company ended all production in December 1980 and thereafter sold its remaining inventory. In June 1981, the Chapter 11 reorganization proceeding was converted to a Chapter 7 liquidation proceeding, *see* 11 U.S.C. § 701 *et seq.* (1988), with a trustee appointed to oversee liquidation.

In the bankruptcy proceeding, IRS filed claims for unpaid withholding taxes totaling $105,771.83. In 1982, IRS made an assessment against Rem on account of Princeton's unpaid withholding taxes for the first quarter of 1978, the fourth quarter of 1979, all of 1980, and the first three quarters of 1981, in the total amount of $550,000.08:

| Period Ending | Unpaid Taxes |
| --- | --- |
| 3/31/78 | $ 77,690.32 |
| 12/31/79 | $ 92,242.57 |
| 3/31/80 | $130,872.87 |
| 6/30/80 | $111,525.46 |
| 9/30/80 | $ 51,562.63 |
| 12/31/80 | $ 12,620.77 |
| 3/31/81 | $ 34,170.77 |
| 6/30/81 | $ 34,170.77 |
| 9/30/81 | $ 5,143.92 |

After Rem disputed the 1982 assessment, and negotiations toward a consensual resolution failed, the government commenced the present action in 1989 to, *inter alia*, reduce this assessment to judgment.

### B. *The Summary Judgment Proceedings*

After a period of discovery, in which depositions were taken of Rem and Mary, and documents were produced, IRS moved for summary judgment on the Princeton assessment. The government relied on parts of Rem's deposition and on checks signed by Rem as evidence that Rem's corporate positions, corporate responsibilities, and check-signing authority made him a person responsible for the company's nonpayment of withholding taxes within the meaning of 26 U.S.C. § 6672(a). The government also argued that Rem's deposition indicated that he knew withholding taxes were required to be paid and knew other creditors were being paid instead, and that his failure to have the withholding taxes paid was therefore willful.

In opposition to summary judgment, Rem argued principally that he had had no actual control or position of responsibility with respect to withholding taxes. First, he asserted that, as indicated in his deposition, his affidavit, and an affidavit submitted by former Princeton director and plant manager Robert Brooks, each of Princeton's manufacturing sites was operated by a local plant manager and maintained its own bookkeeper and controller. Employees at these sites, a total of some 400 at the height of Princeton's operations, were paid from site-specific bank accounts that were separate from the accounts used by the New York City office, and each manufacturing site separately withheld the appropriate taxes from its employees' paychecks. The bank accounts maintained by the New York City office were used primarily to pay the company's general expenses, such as charges incurred for yarn purchases, to pay the salaries of New York City employees, and to wire money into the accounts of the manufacturing sites so the sites could pay, *inter alia*, their payroll expenses. Rem stated that he had had no

authority to sign checks on the Ware or St. Johnsville accounts.

Second, Rem claimed that Mary had exercised total control over Princeton's finances. In support of this contention, he pointed to parts of his deposition and that of his mother, and to affidavits of himself, his brother Richard, Brooks, and former Princeton manager Anna Lifson. For example, Rem testified that though he sometimes sat in on interviews of potential employees for the New York office, he had no authority to hire or fire anyone without authorization from Mary. He was not involved at all in the hiring or firing of employees who worked at the manufacturing facilities. Rem stated that his use of the title "President" was sporadic and was authorized by the board of directors merely as a device to obtain credit for the company and that he did not have the powers of a president. He pointed to the deposition testimony of Mary, which stated that

> in 1978, ... I gave my son Gerard pro forma title as a president, because he was negotiating credit and finalizing, but really, I was in charge because in case my name would be listed as the president, that would link my name with my husband, which was not favorable in the textile industries as a reputable name, so pro forma, I gave him just some kind of title, but really, I was in charge.

(Deposition of Mary Rem, April 23, 1991 ("Mary Rem Dep."), at 34.) Mary also testified that she "require[d] Gerard to bring every contract to [her] before he signed it" (*id.* at 38), and that "Gerard was involved, not in the financing but in the credit and the negotiations, but I was the person who had the final say and he had to report to me. He couldn't do anything on his own" (*id.* at 32–33).

Brooks stated in his affidavit that Mary hired him in mid–1978 as plant manager for the Ware facility. He stated in part as follows:

> 4. I had complete control of all knitting operations in Ware. I was solely responsible for the hiring and firing of all personnel. I had complete signing authority on the Princeton Ware bank accounts from December, 1978 until the fire that completely destroyed the Ware plant in April, 1980.
>
> ....
>
> 6. I was on the Board of Directors of Princeton Industries from my hiring in mid–1978 to July, 1980. I attended several Board meetings, in particular the meeting in March, 1979 where Mary Rem was persuaded to let Gerard Rem handle credit negotiations due to Henry Rem's poor credit standing. While Mary Rem was the President of Princeton and supervised daily operations, because of Mary Rem's credit problems Gerard Rem was authorized by the Board to sign credit applications and handle credit negotiations as President.

(Affidavit of Robert Brooks dated March 13, 1992 ("Brooks Aff."), ¶¶ 4, 6.) Brooks also stated that when he was hired, "Mary Rem clearly informed me that she was in control of the company," and though in mid–1979 Mary reorganized operations by hiring a new chief executive officer and a new sales manager, she informed Brooks that she would remain as chairman and that Brooks was to keep her informed of plant operations. (*Id.* ¶ 7.) Brooks stated that

> Gerard Rem's role was to handle Princeton's computer and information requirements and to handle negotiations on credit.... Gerard was also responsible for ensuring that the computer system would provide the knitting plant with information about sales projections.
>
> 9. As a part of the re-organization of Princeton in mid–1979, Gerard Rem was no longer active on a daily basis. Richard Rem came back to Princeton and handled coordination of production to sales.

(*Id.* ¶¶ 8, 9.)

Richard Rem stated in his affidavit that when he returned to Princeton in late 1979 at Mary's request, "[a]s a condition of my return, I insisted that Gerard Rem not be allowed to have any control—such as signing checks—because he had no textile experience or knowledge about the business." (Richard Rem Aff. ¶ 6.) Richard also stated that

> [w]hile Gerard Rem may have at times used the title of President, this was strictly

as an accommodation to the reality of Henry and Mary Rem's poor credit standing. At no time did he control daily operations, supervise the bookkeeping department, or have any authority with regard to accounting matters or tax payments. Mary Rem and the employees were well aware that Gerard Rem was limited to computerizing operations and negotiating credit. Mary Rem signed as President when she signed documents that did not involve credit.

(*Id.* ¶ 4.) After Richard's late–1979 return to Princeton, Rem came to the office an average of only twice a week.

Rem stated in his affidavit that, although at one point he had been made a signatory on certain of Princeton's New York bank accounts to facilitate his credit negotiations, his status as a signatory on those accounts was revoked in June 1979. Shown a number of 1980 checks at his deposition, Rem acknowledged having signed certain of them but testified that the signature on others did not appear to be his. Lifson, hired by Mary as an assistant in mid–1979 and promoted to Accounts Payable Manager in 1980, stated in her affidavit that "[i]n late 1979, Mary Rem changed the New York office bank accounts so that she was the only sole-signatory." (Affidavit of Anna Lifson dated March 12, 1992 ("Lifson Aff."), ¶ 4.) Lifson listed the six accounts and the persons who had been given power to sign checks. On each, Mary had the power to sign alone; on only account one was Rem listed at all, and on that he was required to obtain a second signature. Rem stated that permission for him to cosign even that one account was merely provision for "small cash emergencies when my mother was travelling." (Rem Aff. ¶ 18.)

In addition, Lifson stated that "[a]ll the payroll records were prepared by the bookkeeper and submitted to the controller. After approval by the Controller, the payroll tax returns were signed by Mary Rem" (*id.* ¶ 5); and "[a]t no time during my employment with Princeton did Gerard Rem become involved with paying creditors of [*sic* ] taxes, nor did he have any dealings with the company's finances apart from negotiating factoring and loan terms" (*id.* ¶ 8).

Rem also disputed IRS's contention that his failure to cause Princeton to pay the withholding taxes was willful. First, he contended that he had not known prior to 1980 that any withholding taxes were unpaid. He testified that he had no responsibility for personnel matters and, lacking knowledge, could not be considered to have acted willfully. As to 1980, he testified that after the fire, he and Mary would review lists of outstanding bills prepared by the bookkeeping personnel and that Mary made the final decisions as to which bills would be paid. Though Rem recommended that they pay the withholding taxes, Mary decided that commercial creditors should be paid and that IRS would be paid out of the insurance proceeds; Rem stated that Mary forbade him to pay the taxes. Rem also testified that even in 1980 he thought some of the withholding taxes were being paid because those taxes "were on a list of payables that had to be paid." (Rem Dep. at 90.)

Finally, Rem disputed the amount of the IRS assessment, contending both that many of the quarterly amounts were inflated and that Princeton had made payments that had been overlooked. He argued that the amounts assessed for 1980 and 1981 were inflated because after April 1980 the company had no employees in Ware, and had about 20 percent of its prior workforce in St. Johnsville. As to his contention that some tax payments had in fact been made for time periods covered by the IRS assessment, Rem pointed to a dozen checks signed by him and made payable to IRS during the first quarter of 1978. Most of these checks were attached to the government's summary judgment motion as support for its contention that Rem had check-signing authority at Princeton, and to the extent that the copies in the record are legible, they appear to total more than $90,-000, a sum that exceeded Princeton's assessed withholding tax liability for that quarter. Rem also testified that sometime during 1980 "we were contacted by the IRS agent and told there were taxes owing, and we started making payments directly to the IRS agent." (Rem Dep. at 55.) He also stated that IRS had received a bankruptcy dividend of $150,771.83 for some of the past due taxes. (Rem Aff. ¶ 65.)

In an Opinion and Order dated August 4, 1992 ("Opinion") the district court granted IRS's motion for summary judgment. The court first concluded that Rem was a responsible person within the meaning of § 6672 because Rem had significant control over Princeton's finances. Opinion at 5. Noting Rem's assertion that "in 1980, his mother, wanting tighter control over the company, restricted his check-signing authority so that he could not write checks without another's signature," Opinion at 6, the court found that "the Government has submitted evidence disproving the defense's assertion," *id.* The court noted that on five of the checks submitted by the government, only Rem had signed, and it ruled that the government's submission of checks signed by Rem, in conjunction with the evidence regarding Rem's role at Princeton, established that Rem had significant control over Princeton's disbursement of funds.

The court found that the government had successfully refuted Rem's contention that he could make no major decision without Mary's approval:

He asserts that all major decisions including the payment of checks for more than $1000.00 had to be approved by his mother, Mary Rem, before being executed. Finally, Rem argues that a determination of this issue necessarily raises a factual dispute which is not ripe for summary judgment. The Government counters this argument by sufficiently demonstrating that Mary Rem's approval was merely formalistic and did not constitute a legal impediment to the issuance of checks....

.... Rem's possible reluctance to bypass his mother's authority for fear of reprisal is not enough to escape liability under § 6672(a).

.... Furthermore, although Rem argues that he needed his mother's approval to disburse funds, he admits that he did not need authorization for payments less than $1000.00.

*Id.* at 6–8.

Also, by joining the company in order to establish credit for Princeton, Rem, a Harvard Business School graduate, became significantly involved in the company's finances. According to the undisputed record, he was in charge of negotiating and obtaining credit from banks and factors. Rem alleges that his involvement was merely superficial as he was only standing in for his parents who had credit problems. The Court finds this argument totally unsupported by the record. Rem was the person who sought credit for Princeton and was responsible for the corporation's financial stability. This establishes that Rem was intimately involved in Princeton's financial affairs. Also, Rem periodically reviewed financial reports prepared by the company's accountant.... Furthermore, his position was not one of a mere "employee", but one that required him, as an officer, to continuously represent Princeton's financial status to its various creditors. Rem as an officer and shareholder of Princeton exercised a high degree of financial control and responsibility and therefore should be held accountable for a failure to pay the IRS.

*Id.* at 8.

The court also concluded that Rem had failed to show that there was a genuine issue as to whether his failure to remit the withheld taxes was willful. It found that Rem "made the initial determination of the order in which large bills were to be paid subject to his mother's approval and had discretion to pay smaller bills," *id.* at 6, and that Rem admitted knowing in 1980 that Princeton was paying other creditors in lieu of paying taxes that were due. The court made no reference to the controversy regarding the proper amount of the assessment.

After the parties agreed to dismiss the remaining issues, final judgment was entered against Rem in favor of IRS. This appeal followed.

## II. DISCUSSION

Section 7501(a) of the Internal Revenue Code ("Code") requires an employer to remit withholding taxes to IRS. 26 U.S.C. § 7501(a) (1988). IRS regulations require that such remittances be made on a quarterly basis. *See* 26 C.F.R. § 31.6011(a)–4 (income taxes); *id.* § 31.6011(a)–1 (FICA taxes). If

the employer does not pay withholding taxes to IRS as required, § 6672(a) of the Code imposes personal liability for unremitted taxes upon any person responsible for remitting the taxes:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

Rem contends that summary judgment was improperly granted against him because there were genuine issues to be tried as to (1) whether he was a person referred to in § 6672(a), (2) whether his failure to cause Princeton to pay withholding taxes was "willful[ ]," and (3) whether all of the amounts assessed by IRS were (a) due and (b) unpaid.

## A. *The Requirements of § 6672(a)*

The term "[a]ny person required to" perform the collection, accounting, or payment functions described in § 6672(a) has been construed to include any individual who is a " 'responsible person' for collection and payment of the employer's taxes." *Fiataruolo v. United States,* 8 F.3d 930, 938 (2d Cir.1993) ("*Fiataruolo*") (quoting *Godfrey v. United States,* 748 F.2d 1568, 1574 (Fed.Cir.1984)); *see also Slodov v. United States,* 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978). Because § 6672(a) is "a vital collection tool" intended to ensure the smooth flow of necessary revenues to the government, "courts generally take a broad view of who qualifies as a responsible person," *Fiataruolo,* 8 F.3d at 938.

More than one individual may be a responsible person within the meaning of § 6672(a). *See, e.g., Fiataruolo,* 8 F.3d at 939; *Kinnie v. United States,* 994 F.2d 279, 284 (6th Cir.1993); *Gephart v. United States,* 818 F.2d 469, 476 (6th Cir.1987) ("[w]hile it may be that [other corporate officials] were

*more* responsible than plaintiff, and exercised *greater* authority, this does not affect a finding of liability against the plaintiff" (emphasis in original)). And it is not necessary that the individual in question " 'have the final word as to which creditors should be paid in order to be subject to liability under this section.' " *Hochstein v. United States,* 900 F.2d 543, 547 (2d Cir.1990) ("*Hochstein*") (quoting *Gephart v. United States,* 818 F.2d at 475), *cert. denied,* —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). The determinative question " 'is whether the individual has *significant control* over the enterprise's finances.' " *Fiataruolo,* 8 F.3d at 939 (quoting *Hochstein,* 900 F.2d at 547 (emphasis in *Fiataruolo* )). No single factor is dispositive in evaluating whether the individual had significant control; that determination must be made in light of "the totality of the circumstances," *Fiataruolo,* 8 F.3d at 939. Relevant considerations include whether the individual

> (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

*Id.* at 939; *see also Hochstein,* 900 F.2d at 547; *Barnett v. IRS,* 988 F.2d 1449, 1455 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993); *Bowlen v. United States,* 956 F.2d 723, 728 (7th Cir.1992). Thus, though § 6672(a) "is not meant to ensnare those who have merely technical authority or titular designation," *Fiataruolo,* 8 F.3d at 939, the section encompasses " 'all those connected closely enough with the business to prevent the [tax] default from occurring,' " *id.* (quoting *Bowlen v. United States,* 956 F.2d at 728).

Even if an individual is found to be a responsible person within the meaning of § 6672(a), the section imposes no liability on him unless his failure to collect, account for, or remit the withholding taxes was "will-

ful[ ]." To be willful, conduct need not stem from an "evil motive or intent to defraud," *Kalb v. United States*, 505 F.2d 506, 511 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); but it must amount to more than negligence, *see id.* The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead. *See, e.g., Hochstein*, 900 F.2d at 548; *United States v. Running*, 7 F.3d 1293, 1298 (7th Cir.1993) ("a responsible person acts willfully when he permits funds of the corporation to be paid to other creditors when he is aware that withholding taxes due to the government have not been paid"). Thus, failures were "willful[ ]" within the meaning of § 6672(a) if they were " 'voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government.' " *Kalb v. United States*, 505 F.2d at 511 (quoting *Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970)).

■ If the responsible person had the requisite knowledge, even the fact that he would have been discharged for paying the taxes is insufficient to make the failure to pay not willful. *See, e.g., Hochstein*, 900 F.2d at 548; *United States v. Running*, 7 F.3d at 1298.

■ On the other hand, a responsible person's failure to cause the withholding taxes to be paid is not willful if he believed that the taxes were in fact being paid, so long as that belief was, in the circumstances, a reasonable one. *See Kalb v. United States*, 505 F.2d at 511. If the belief was not reasonable, he will be liable under § 6672(a). Further, even if a responsible person did not know contemporaneously of the company's nonpayment of withholding taxes, he will be held liable for nonpayment with respect to any period during which he was a responsible person if, when he became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes. *See Kinnie v. United States*, 994 F.2d at 285; *Honey v. United States*, 963 F.2d 1083, 1088–

89 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); *Davis v. United States*, 961 F.2d 867, 871–78 (9th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 969, 122 L.Ed.2d 124 (1993); *see also Kalb v. United States*, 505 F.2d at 511 ("Willful conduct also includes failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government.").

■ An individual against whom IRS has made a § 6672(a) assessment has the burden of proof with respect to the elements of liability under that section. *See, e.g., Lesser v. United States*, 368 F.2d 306, 310 (2d Cir. 1966) (en banc on this issue). Thus, he must prove by a preponderance of the evidence either that he was not a "responsible person" or that his failure to cause the withholding taxes to be paid was not willful. *See, e.g., Fiataruolo*, 8 F.3d at 938.

### B. *Summary Judgment Principles*

■ Summary judgment may be granted only if there is no genuine issue of material fact to be tried and the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). When the moving party has pointed to the absence of evidence to support an essential element on which the party opposing summary judgment has the burden of proof, the opposing party, in order to avoid summary judgment, must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993); Fed. R.Civ.P. 56(c).

■ When determining whether there is a genuine issue of fact to be tried, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91

L.Ed.2d 202 (1986); *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.1991). On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried. *See, e.g., Balderman v. United States Veterans Administration*, 870 F.2d 57, 60 (2d Cir.1989); *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir.1987); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment. *See, e.g.,* Fed. R.Civ.P. 56(e), 1963 Advisory Committee Note; *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 2086, 56 L.Ed.2d 677 (1978); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 472–73, 82 S.Ct. 486, 490–91, 7 L.Ed.2d 458 (1962); *Centronics Financial Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir.1978); 6 *Moore's Federal Practice* ¶ 56.02[10], at 56–45 (2d ed. 1986).

■ In the context of a § 6672(a) dispute, summary judgment may be appropriate where there are no questions as to either the assessed individual's control of company funds and decisionmaking authority or his knowledge of the deflection to payees other than IRS of funds that could be used to pay withholding taxes. *See, e.g., Skouras v. United States*, 26 F.3d 13, 14 (2d Cir.1994) (per curiam), and cases cited therein; *Teel v. United States*, 529 F.2d 903, 905 (9th Cir. 1976); *see also Kalb v. United States*, 505 F.2d at 511 (directed verdict upheld as to one individual but not as to another); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–51, 106 S.Ct. at 2511 (summary judgment standard "mirrors the standard for a directed verdict"). Where, however, the individual's position makes his claim of ignorance of nonpayment plausible and there are no other indicia of knowledge, the matter of his willfulness is an issue to be tried. *See Kalb v. United States*, 505 F.2d at 511.

C. *The Evidence as to Rem as a Responsible Person*

■ The matter of whether Rem was a responsible person within the meaning of § 6672(a) presented a number of fact questions. Some of the *Fiataruolo/Hochstein* factors were undeniably present, for it was conceded, for example, that Rem had a 20% ownership interest in the company and was both an officer and a director. However, since § 6672(a) was not meant to ensnare those who have merely a titular designation, Rem's contention that his title of president was spurious, being merely a device to induce commercial or financial organizations to grant the company credit, required a probing of the substance of that title, and we conclude that the district court's analysis did not view the evidence in the light most favorable to Rem.

For example, contrary to the district court's conclusion that Rem's contention that his involvement in credit negotiations was undertaken solely because of his parents' poor credit ratings was "totally unsupported by the record," Opinion at 8, there were several witnesses who supported Rem's contention. Richard's affidavit stated that Rem's use of the title president "was strictly as an accommodation to the reality of Henry and Mary Rem's poor credit standing." (Richard Rem Aff. ¶ 4.) Mary similarly testified at her deposition that Rem was given the "pro forma title as a president, because ... in case my name would be listed as the president, that would link my name with my husband, which was not favorable in the textile industries as a reputable name." (Mary Rem Dep. at 34.) And Brooks's affidavit stated that Mary Rem was persuaded to take this course, at a March 1979 board meeting, "due to Henry Rem's poor credit standing," and that the board authorized Rem to sign credit applications and handle credit negotiations as president "because of Mary Rem's credit problems." (Brooks Aff. ¶ 6.)

Similarly, the court's reliance on the fact that Rem "did not need authorization for payments less than $1000," Opinion at 8, for the proposition that Rem had the ability to pay Princeton's withholding taxes surely failed to draw reasonable inferences in Rem's favor. Even assuming that it was reasonable to envision Rem as permissibly signing more

than 550 checks for $999 each to pay the $550,000 that IRS claims to be due, the court's statement appears to ignore the affidavits of Lifson and Rem stating that Rem had signing authority only for one account and that for that account he required a co-signer. Moreover, Rem's affidavit stated that that lone account was kept only for small emergencies, and given Princeton's cash-flow problems, we think it not reasonable to infer that such an account would contain $550,000.

Further, the district court ruled that "the Government has submitted evidence disproving the defense's assertion" that Rem's check-signing authority was sharply limited and that after July 1979 he required a co-signer. Opinion at 6. Instead of drawing available inferences that were favorable to Rem, this ruling appears to have weighed the evidence and drawn inferences against him. Rem's assertion was supported by, *inter alia*, his own deposition testimony, his own affidavit, and the affidavit of Lifson. Further, Richard's affidavit stated that Richard had agreed in late 1979 to return to the company only if Mary would take away whatever check-signing authority Rem then had. And in accepting the five 1980 checks submitted by the government as evidence of Rem's single-signatory power, the court apparently rejected as not credible Rem's deposition testimony that most of these signatures did not appear to be in his handwriting. Though a trier of fact may well reach the same evaluation, the weighing of the evidence and the assessment of credibility were not appropriate for the determination of a summary judgment motion.

The district court placed heavy reliance on the fact that Rem played a leading role in the credit negotiations, inferring from that role that he was also therefore responsible for paying the withholding taxes. *See, e.g.,* Opinion at 8 ("by joining the company in order to establish credit for Princeton, Rem, a Harvard Business School graduate, became significantly involved in the company's finances"). We see no necessary connection between negotiation of credit agreements and responsibility for payroll taxes sufficient to make evidence of the former conclusively binding proof of the latter as a matter of law. Further, the court's conclusion contradicts the evidence presented by Rem that payroll matters were not within his domain. That evidence included not only Rem's own affidavit and deposition testimony, but also the affidavits of Richard (*see* Richard Rem. Aff. ¶ 4 (at no time did Rem "control daily operations, supervise the bookkeeping department, or have any authority with regard to accounting matters or tax payments")); Brooks (*see* Brooks Aff. ¶ 4 (Brooks had complete responsibility for hiring, firing, and bank accounts with respect to Ware plant); and Lifson (*see* Lifson Aff. ¶ 8 (apart from negotiating credit, Rem had nothing to do with the company's finances, and "[a]t no time during [Lifson's] employment with Princeton did Gerard Rem become involved with paying creditors o[r] taxes")).

In sum, although there plainly was sufficient evidence from which one could infer as a matter of fact that Rem had significant control over Princeton's finances and thus was a responsible person within the meaning of § 6672(a), the sufficiency of the government's evidence was not the proper test on a motion for summary judgment. With all reasonable inferences from the evidence drawn in Rem's favor, the record presented genuine questions of fact to be tried on this issue.

### D. *The Evidence as to Rem's Willfulness*

The question of whether Rem's failure to pay the withholding taxes was willful as a matter of law, assuming that he was a responsible person within the scope of § 6672(a), must receive a mixed answer.

 It is clear from Rem's admissions that following the April 1980 fire, he knew that the required withholding taxes were not being paid. He testified that he recommended that they be paid and that his mother vetoed the suggestion, insisting instead that current creditors be paid on a current basis and that payment of the withholding taxes be postponed until the expected insurance money was received. During that period, Rem knew those taxes were due; he knew they were not being paid; and he knew that other creditors were being paid instead. Thus, if he is found to have had significant

control in the period following the fire, there can be no genuine issue to be tried as to his willfulness during that period; his failure, in those circumstances, to pay whatever withholding taxes were due with respect to that period must be ruled willful as a matter of law.

■ Rem also testified that in 1980 he believed the company was in fact paying the required withholding taxes. That testimony was somewhat vague as to the part of that year in which he claimed to have held that belief. If he was referring to the period after April 1980, such a belief would have been unreasonable as a matter of law in light of his testimony that his mother exercised total control and forbade the current payment of those taxes.

Nonetheless, giving Rem the benefit of all favorable inferences in the context of a motion for summary judgment against him, we conclude that his testimony was sufficient to permit the inference that prior to 1980 he had no idea that the company was in arrears on withholding taxes; that he learned of the deficiency in early 1980; and that he believed the company was making weekly payments fully satisfying its withholding tax obligations prior to the April 1980 fire. We are aware of no evidence that so squarely contradicts this scenario as to make his professed pre-April 1980 belief unreasonable as a matter of law. Accordingly, depending on whether and during what time periods Rem is found to have been a responsible person, there may be a question of fact to be tried as to his willfulness with respect to withholding taxes owed for the period prior to the April 1980 fire.

In sum, we conclude that the record, with all reasonable inferences and credibility assessments made in Rem's favor, revealed genuine issues to be tried as to both the "responsible person" and willfulness issues. In addition, assuming that both of those issues are decided adversely to Rem, there appear to be issues to be tried with respect to the proper amount of the IRS assessment, a matter not previously addressed by the district court.

## CONCLUSION

We have considered all of IRS's arguments in support of the award of summary judgment and have found them to be without merit. The judgment of the district court is vacated and remanded for further proceedings not inconsistent with this opinion.

LEVAL, Circuit Judge, concurring.

I concur in Judge Kearse's excellent and thorough opinion, but write separately to underline the importance, in my view, of certain disputed facts. Rem testified that his mother, who chaired the board of directors and was the controlling shareholder of Princeton, exercised complete control and forbade him from paying the overdue withholding taxes. These facts might bear importantly on whether Rem should be found a "responsible person."

While it is true that § 6672 concerns itself with the important goal of protecting trust funds owed to the United States by providing alternate sources from which to collect unremitted taxes owed by a corporation on account of its employees, Congress refrained from imposing liability on all available targets. It did not, for example, impose liability on all officers, directors and stockholders of the delinquent corporation; it limited the liability to those persons in the corporation who bore responsibility for seeing to it that the tax payments were made. The statute thus provides, insofar as here relevant, that the liability would fall on persons "required to ... pay over" the delinquent tax, who willfully failed to do so. 26 U.S.C. § 6672 (1988).

In defining the standards for determining who falls within this statutory definition, courts developed the term "responsible persons" and concluded that their identification depends on whether they exercised "significant control" over the corporation's finances. *Fiataruolo v. United States,* 8 F.3d 930, 939 (2d Cir.1993); *Hochstein v. United States,* 900 F.2d 543, 547 (2d Cir.1990); *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir. 1987); *Gephart v. United States,* 818 F.2d 469, 473 (6th Cir.1987). The point of the "significant control" inquiry is to determine whether the individual effectively exercised

(or participated in the exercise of) sufficient power to cause the delinquent taxes to be paid, but failed to do so, using the Government's money instead for other purposes. *See Fiataruolo,* 8 F.3d at 939.

Acknowledging the great importance of the ability of the Government to collect its revenue trust funds, we must also recognize the potentially inappropriate harshness of the "responsible person" remedy, if it is applied overbroadly and without care to insure that the person truly possessed the type of power necessary to justify it. The defendant in a suit under § 6672 is often an employee (as opposed to an owner) who has not personally benefitted from the misdirection of the Government's funds. If the defendant furthermore had no influence over the decision as to what payments would be made, the imposition of a potentially huge liability can be both harsh and unfair.

In *Unger v. United States,* No. 90 Civ. 0384, 1994 WL 52574, 1994 U.S.Dist. LEXIS 1375 (S.D.N.Y. Feb. 10, 1994), Unger, who although a corporate officer, was likened by the district judge to "a cabin boy on a sinking ship," was found liable for his corporate employer's tax debt of over one million dollars. The district court granted summary judgment in the Government's favor despite Unger's testimony that the company's sole shareholder, chief executive officer, and president exclusively made all decisions as to the payment of corporate funds, and rejected Unger's urging to pay the taxes owing. Although the district judge deplored imposing liability, he read *Hochstein* to make irrelevant whether the defendant was barred by the orders of a superior from paying the taxes.

I do not understand that to be the holding of *Hochstein.* Hochstein's employer, Safelon, was insolvent and operating under the control of its factor Rosenthal, which periodically supplied operating funds for necessities. Hochstein was the controller; he received and paid out the funds infused by the factor, and was held liable for his failure to pay them to the IRS. Judge Newman, in dissent, argued that Hochstein had been forbidden by the factor to make the tax payment. The majority opinion holding Hochstein liable took pains to refute Judge Newman's contention that Hochstein had been forbidden to pay the tax. It noted, "Because Rosenthal did not specify the purposes for which the funds were to be used once they were given to Safelon, it is unclear how Hochstein's payment of taxes could have amounted to noncompliance with Rosenthal's instructions." *Hochstein,* 900 F.2d at 548, n. 2. Although the majority opinion does not expressly assert how the judgment would have been affected had Hochstein received clear orders not to use the funds to pay the tax, the fact that it made a point of refuting Judge Newman's suggestion rather strongly implies that the majority would have considered such orders pertinent.

The "core question" is "significant control." *Fiataruolo,* 8 F.3d at 939. The power to sign checks and the holding of corporate office are indeed factors that courts have listed as helpful in deciding whether an individual possessed the necessary power, but they are only factors. Either can exist in circumstances where the individual in reality does not possess significant control over corporate finances. When this is so, the potentially devastating "responsible person" liability should not be imposed. Neither, however, may a person who truly participates in the exercise of that decisionmaking power hide behind technicalities to avoid responsibility.

If, despite his corporate title, Rem establishes at trial that he was totally subordinate to the orders of his mother, who chaired the board and was Princeton's principle shareholder, and that she exercised complete control over payments and directed that the taxes not be paid, Rem might satisfy the factfinder that he did not have significant control and is therefore not a responsible person under Section 6672.