**Nathan UNGER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 90 Civ. 0384 (WK).**

United States District Court,
S.D. New York.

March 17, 1997.

Wallace Musoff, Law Offices of Wallace Musoff, New York City, for Plaintiff.

Jeffrey Oestericher, Nancy Milburn, Assistant United States Attorneys, United States Attorney's Office, New York City, for Defendant/Third–Party Plaintiff.

Jerome Kamerman, New York City, for Third–Party Defendant.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

This action by Nathan Unger ("Unger") for the refund of taxes illegally assessed and collected has its origins back in 1984 when the company by which he was employed, Robert Landau Associates, Inc. ("RLA"), went bankrupt without having remitted to the Internal Revenue Service ("IRS") a total of $1,046,376.30 it had withheld from its employees during the first three quarters of 1984 ("the tax period"). In 1987, the IRS, having determined that Unger was a responsible person as defined in 26 U.S.C. Section

6672 ("Section 6672"), made an assessment against him for the entire sum of $1,046,-376.30, and actually seized all his available assets totalling $20,500. In addition, Unger paid an administrative fee of $500 which was required for filing a claim for refund. In January of 1990, Unger instituted this action. The Government responded with an answer seeking to dismiss the Complaint and a counter-claim seeking to reduce to judgment the IRS' $1,046,376.30 assessment.

In April of 1993, after three years of discovery, the Government made a motion for summary judgment. Believing ourselves to be constrained by the Second Circuit decision in *Hochstein v. United States* (2d Cir.1990) 900 F.2d 543, *cert. denied* (1992) 504 U.S. 985, 112 S.Ct. 2967, 119 L.Ed.2d 587 (hereinafter "*Hochstein*"), we granted the Government's motion. Eight months later, the Second Circuit announced its decision in *United States v. Rem* (2d Cir.1994) 38 F.3d 634 (hereinafter the "*Rem* decision"). Realizing that the *Rem* decision demonstrated that we had been in error, we suggested to Unger that he make a motion to reconsider our order granting the Government's motion for summary judgment. We granted his subsequent motion and ordered that the matter be put down for trial. On December 19, 1996, a jury returned a verdict against Unger. His motion to set aside that verdict is now before us.

## A. THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The three years of discovery leading up to the Government's motion for summary judgment produced evidence which revealed that Robert Landau ("Landau"), RLA's president and sole-stockholder, founded the company in 1975. With the exception of a short period from when he sold his controlling interest in RLA to another company until 1979 when he repurchased it, Landau was RLA's sole owner and controlled every aspect of its activities. In March of 1978 Landau hired Unger to work at RLA. Unger was 22 years old and had just graduated from college with a bachelors degree in accounting and had never held a full-time job. Landau hired Unger as an assistant to the controller and fixed his

salary at approximately $10,000 annually. Unger remained employed at RLA until he resigned in December 1984. During his six and one-half years of employment at RLA, Landau several times changed Unger's duties. Sometime near the end of 1983, Landau directed that RLA's then Senior Vice President and Chief Financial Officer, Nicholas Gilles ("Gilles"), be replaced by Unger; and fixed Unger's salary at $100,000. Government Exhibits D, E and S substantially describe the powers Landau then conferred upon Unger.

These powers—so far as the record indicates—were in no way modified throughout the tax period. These documents indicate that Unger was one of three people at RLA with the technical authority to review and approve all agreements (Ex. D and S) and individually sign checks (Ex. E). No documentary evidence offered either by Unger or the Government gives any indication of how Unger used these powers.

From the parts of Unger's pre-trial deposition that he and the Government offered on the motion for summary judgment it appears that Unger's position during the tax period involved overseeing the accounting and administrative functions of RLA, reporting directly to Landau. Within these functions, Unger's duties included dealing with creditors, preparing weekly or bi-weekly lists of accounts payable—including any taxes which were due—for review with Landau, writing checks to cover payments designated by Landau and signing employee payroll checks after review with Landau. With respect to Unger's authority to hire and fire employees, he exercised this authority only when directed by Landau. Similarly, Unger signed leases and other agreements on behalf of RLA when directed by Landau.

It is undisputed that during the tax period RLA did indeed fail to remit the withheld taxes. With respect to the resulting liability, Unger was informed by an outside RLA accountant that he could be assessed a personal penalty for the unremitted funds. His response to this was repeatedly to urge that the taxes be remitted, but Landau specifically refused to let him do so. At Landau's

direction Unger continued to pay other creditors.

Examination of all the evidence before us on the motion for summary judgment—whether offered by Unger or by the Government—does not disclose a single instance where it could be said that Unger signed any check or took any action in circumstances where he was not confident that he was acting in accord with Landau's expressed wishes.

Unger's position with respect to the foregoing has been consistent. It was simply stated in his original claim for refund to the IRS (Ex. A to his Complaint in this action):

> [Unger] was not a stockholder of Robert Landau Associates, Inc. and not permitted to exercise discretion with respect to whom corporate disbursements should be made or in what amount. Such discretion was exercised solely by the sole-stockholder and corporate principal, Robert Landau, from whom [he] took direction.

When we were considering the motion for summary judgment we were convinced that logic and the demands of justice supported Unger's position. However, the Government persuaded us that *Hochstein* required a holding that if corporate records purported to give Unger authority to draw appropriate checks to the IRS he was a "responsible person" regardless of what the true facts might have been. We accordingly granted the Government's motion for summary judgment. In the hope that an appeal from our order might result in a modification of the Circuit's views, we observed (1994 WL 52574, at *6):

> Unger was twenty-eight years old when the tax delinquency occurred. Since then he has been stripped of all his assets (including a life insurance policy) and is faced with an undischargable debt of more than one million dollars. So far as we can determine, the only course open to him is to migrate to some more civilized country and try to start life over again. It is difficult to understand how a rational government could so treat its own citizen. It certainly could not do so to a prisoner of war. Were we sitting in a circuit where the question was open, we would adopt as

our own now Chief Judge Jon O. Newman's eloquent dissent in *Hochstein.* 900 F.2d at 550. Unhappily, we do not have that option.

## B. *THE REM DECISION*

As we have noted, the Court of Appeals announced the *Rem* decision about eight months after our ruling. The facts in that case were in many ways similar to those now before us. A corporation known as Princeton Industries Inc. ("Princeton") had gone bankrupt at a time when some five hundred and fifty thousand dollars of withheld taxes had not been remitted to the IRS. The question before the Court was whether the district court—in reliance upon *Hochstein*—had properly granted the Government's motion for summary judgment upholding an IRS assessment for the full amount against one Gerard Rem (hereinafter "Gerard"), a Princeton employee, officer, stockholder and director. The Court of Appeals reversed the grant of summary judgment on the ground, among others, that there existed a factual question of whether or not Gerard had been a *responsible person* as defined by Section 6672(a).

With respect to that question, Gerard did not dispute the existence of many facts which cumulatively—or even separately—would seem to suggest that he had indeed been such a *responsible person.* Princeton had been organized by Gerard's father who for most of its existence had been its sole stockholder. Due to illness and other considerations, the father had divested himself of his stock, assigning most of it (along with control of the Company) to his wife. At some point, Gerard made an investment in the Company, acquiring 20% ownership. Gerard had some checkwriting authority and at different times had various official titles signifying authority, including that of President. As President he had executed the petition which placed the Company in bankruptcy. However, pointing to affidavits and deposition testimony, Gerard claimed there was evidence suggesting that, regardless of appearances, other members of his family in fact controlled the Company and had assigned to him limited duties which did not include the payment of taxes.

He further pointed to evidence which would suggest that his mother actually exercised complete control of the Company on the family's behalf; and that, having determined to defer payment to the IRS until certain insurance claims had been resolved, she had specifically forbidden remittance of withheld taxes. The Court ruled that the existence of such possibilities was sufficient to defeat the Government's motion for summary judgment.

Two opinions accompanied the Court's decision. The main opinion was authored by Judge *KEARSE* with the silent acquiescence of Judge *PIERCE*. Judge *LEVAL* filed a concurring opinion.

In a preliminary explanation of Section 6672(a)'s definition of a *responsible person*, Judge *KEARSE* in her opinion observes (at p. 642) "the determinative question is whether the individual has *significant control* over the enterprises finances" (inner quotes and citations omitted, emphasis in original). Further,

> No single factor is dispositive in evaluating whether the individual had *significant* control; that determination must be made in light of the totality of the circumstances.

(inner quotes and citations omitted, emphasis ours). Finally,

> Thus though § 6672(a) is not meant to ensnare those who have merely technical authority or titular designation, the section encompasses all those connected closely enough with the business to *prevent* the [tax] default from occurring

(inner quotes and citations omitted, emphasis ours).

Judge *LEVAL* concurred in "Judge Kearse's excellent and thorough opinion," and filed his own opinion in order to "underline the importance * * * of certain disputed facts." He particularly wished to caution the district judge on remand and the Bar in general against being misled as to the true meaning of *Hochstein*, as we had been in our original decision granting the Government's motion for summary judgment against Unger. Judge *LEVAL* observed (at 647):

> Although the district judge [in *Unger*] deplored imposing liability, he read *Hochstein* to make irrelevant whether the de-

fendant was barred by the orders of a superior from paying the taxes.

I do not understand that to be the holding of *Hochstein*. Hochstein's employer, Safelon, was insolvent and operating under the control of its factor Rosenthal, which periodically supplied operating funds for necessities. Hochstein was the controller; he received and paid out the funds infused by the factor, and was held liable for his failure to pay them to the IRS. Judge Newman, in dissent, argued that Hochstein had been forbidden by the factor to make the tax payment. The majority opinion holding Hochstein liable took pains to refute Judge Newman's contention that Hochstein had been forbidden to pay the tax. It noted, "Because Rosenthal did not specify the purposes for which the funds were to be used once they were given to Safelon, it is unclear how Hochstein's payment of the taxes could have amounted to noncompliance with Rosenthal's instructions." *Hochstein*, 900 F.2d at 548, n. 2. Although the majority opinion does not expressly assert how judgment would have been affected had Hochstein received clear orders not to use the funds to pay the tax, the fact that it made a point of refuting Judge Newman's suggestion rather strongly implies that the majority would have considered such orders pertinent.

Aside from calling specific attention to our error in granting the Government's motion for summary judgment, Judge *LEVAL*'s opinion preliminarily notes (at 646.)

> [Gerard] Rem testified that his mother, who chaired the board of directors and was the controlling shareholder of Princeton, exercised complete control and forbade him from paying the overdue withholding taxes. *These facts might bear importantly on whether Rem should be found a responsible person.* (emphasis ours)

It further observes (at 647):

> The defendant in a suit under § 6672 is often an employee (as opposed to an owner) who has not personally benefitted from the misdirection of the Government's funds. If the defendant furthermore *had no influence over the decision* as to what payments would be made, the imposition of

a potentially high liability can be both harsh and unfair. (emphasis ours)

The Government's argument that we should not consider the *Rem* case to be controlling is set forth in its Memorandum in Opposition to Unger's Motion to Vacate our Order Granting Summary Judgment against him. Its principal contention is that Judge *LEVAL*'s cogent observations should be ignored because his opinion was labelled "concurring." There is no merit in this contention. In the first place, were this contention accepted it would avail the Government nothing. Judge *LEVAL*'s observations merely underline propositions already established by Judge *KEARSE*. For example, Judge *LEVAL*'s statement about the injustice of subjecting to personal liability an employee who "had no influence over the decision" of remitting funds to the IRS echoes Judge *KEARSE*'s observation that Section 6672(a) "is not meant to ensnare those who have merely technical authority or titular designation" and could not "prevent the [tax] default from occurring."

Moreover, since Judge *LEVAL* clearly indicated that he was writing to give guidance to the District Court on remand (and to the Bar in general), if either Judges *KEARSE* or *PIERCE* were not satisfied that such guidance would be helpful rather than confusing, any such concern would have been clearly expressed. In fact, neither of them suggested any limitation to Judge *LEVAL*'s observations. The situation here is quite different from that in *Dague v. City of Burlington* (2nd Cir.1991) 935 F.2d 1343, 1360, which the Government cites for the proposition that a "concurring opinion is not controlling law." There, the Court was considering the precedential effect of a Supreme Court decision in which "three separate opinions" had been filed. It concluded that one of those opinions—by a Justice "with whom no one concurs"—should not be considered "the law of the land."

■ Accordingly, under guidance of both *Rem* opinions, we deem the controlling questions in the case before us to be: (1) whether or not Unger—regardless of the plethora of formal documentation—firmly believed that his actual authority was limited to following Landau's orders; and if so (2) was such belief reasonable in all the circumstances. We find irrelevant any documents defining Unger's "technical authority or titular designation."

## C. *THE EVIDENCE AT TRIAL*

The evidence at trial was similar to—but much more detailed than—the evidence that was before us when we decided the Government's motion for summary judgment.

There was one matter as to which the evidence then before us was deficient. It gave no clue as to Landau's motive in investing Unger with the powers described in Exhibits D, E and S. Evidence at trial eliminates this gap. According to Unger, he received these powers late in 1983. Allen Chodock, M.D., Landau's close friend and personal physician, testified that Landau first told him of his drug and alcohol problems during the Labor Day weekend in 1983. Tr. at 231–33. Landau's own testimony was that "[t]he only person [he] really trusted with [his] personal life was Nate Unger," whom he considered to be "an honest, decent young man who would not lie, cheat or steal." Tr. at 444 and 580. The inference we draw from these bits of evidence is that, becoming alarmed at the possibility of losing control, he wanted to enlist the services of a person of undoubted loyalty to him who would realize—and act on the realization—that his sole function was to understand and follow Landau's wishes.

Unger's testimony was largely focussed on how he understood and acted upon the powers described in these exhibits. Beyond that, he vividly remembered his first meeting with and employment by Landau; and his discussion with Landau in 1979 when Landau designated him Controller, at which time he questioned his own competence to do the job. Tr. at 274–75. He also mentioned that it was his recollection that he never received the $100,000 salary which Landau fixed when his ultimate powers were established, but had only received "approximately 50, 60 or 65,-

000" dollars in 1984. Tr. at 133.[1]

Turning to Unger's testimony concerning his perception of the powers described in Exhibits D, E and S, and his actions pursuant to such perception, he repeatedly and in many forms of words made clear that he considered his function to be to understand Landau's wishes at any given time, and to make sure that they were honored. For example, he repeatedly testified that he had never signed a check or other document without being confident that it was Landau's wish that he do so. *See, e.g.,* Tr. at 142, 137–38.

Cross-examination brought out the difference between his perception of his duties described in these exhibits and his previous perception. The Government called to his attention testimony in a state tax proceeding wherein he had indicated he had had the power to hire and fire people without consultation. Tr. at 194. After being allowed to refresh his recollection by reading portions of this testimony, he pointed out that it dealt with his powers back in 1980 when the situation was quite different. Landau had then charged him with the administration of the bookkeeping department. Tr. at 276. His duties then included enlarging or reducing the work force as the needs of the department might require. Obviously, Landau would have had no interest in being consulted every time an employee was added or laid-off.

Another question on cross-examination reminded Unger of a situation that had developed when RLA's cash problems became so acute that RLA could not provide cash to pay even ordinary COD charges on supplies required for day-to-day operations. Landau directed Unger to deal with this particular class of creditors, realizing that the situation would make it impossible for him to consult with Landau as to the particular creditors to be paid. As Unger described that situation (Tr. at 204):

> [T]he company was having trouble, you know, certainly with vendors, so there were certain vendors of the company who would not issue credit to the company so we might have had, like, a catchall for a hundred, $200 for a COD delivery for something, you know, stationery or supplies because, again, most companies wouldn't give the corporation credit at the time.

■ We find that the entirety of Unger's testimony establishes beyond peradventure that Unger firmly believed that his actual authority was limited to following Landau's orders and that such belief was reasonable. Accordingly, absent some *evidence* in the record that would provide a reasonable basis for rejecting that testimony, the *Rem* decision would require that the Jury's verdict be set aside. We have carefully reviewed the record and found no such evidence. Specifically, we find that there was no evidence which could suggest that during the tax period Unger—with the just noted specific exception—ever: signed a check or document without being confident that doing so met with Landau's approval; hired or fired anyone except at Landau's direction; or took any other action which might indicate that he considered himself authorized to do anything except in the belief that he was following Landau's wishes.

Our conclusions in that regard are buttressed by the Government's Memorandum of Law in Opposition to Unger's Motion to Set Aside the Verdict. In that eighteen page memorandum the Government only twice suggests the existence of evidence inconsistent with Unger's testimony. At page 14, it asserts:

> Although Unger claimed that during the Tax Period he could only [hire and fire employees] at Landau's behest, Tr. at 335, the evidence showed that while acting as Controller [in 1980]—prior to being promoted to CFO—Unger had the authority to hire and fire employees within his department on his own initiative.

That assertion is an illustration of the Government's confusion as to the issues here involved. Evidence establishing Unger's

---

1. After the trial the Government, at our request, furnished us with copies of all paychecks given to Unger during the latter part of 1983 and all of 1984. They indicate that Unger received a net income of $11,021.84 in the last four months of 1983 and only $36,508.74 in 1984.

perception of what Landau expected of him when he was carrying out the routine task of hiring and firing "employees within his department" would give no indication of what such perception would be after he had undertaken to deal with the emergency powers described in Exhibits D, E and S.

On page 15, the Government argues:

While Unger again claimed that he understood that he did not have the authority to sign checks above a nominal amount without Landau's approval * * * Lewis testified that contrary to Unger's claim, Unger made decisions regarding whether bills should be paid and was the person to go to get a check issued. Tr. at 380–81, 382.

Eugene Lewis ("Lewis"), a close friend of Landau who had been called by him in support of his "insanity" defense, did indeed testify to having seen Unger sign checks "from time to time" (Tr. at 411), and that it was his belief that Unger made the decision himself. Tr. at 380.

However, Lewis did not claim ever to have heard Unger and Landau discuss the extent of Unger's check signing authority (Tr. at 385), and conceded that he had no knowledge as to what understanding may have existed between them with respect to such authority. Tr. at 403. Lewis could therefore shed no light on the question of whether or not Unger was justified in being confident that he was acting in accordance with Landau's wishes when he signed checks "from time to time." Tr. at 411.

In brief, Unger's testimony convincingly established a prima facie case. After three years of discovery before bringing its motion for summary judgment, during which time it had available to it every bit of documentary evidence that had been in RLA's possession and the ability to interview and/or depose any relevant person who had either worked for or done business with RLA, the Government was not able to come up with a scintilla of evidence that would authorize a jury to reject Unger's testimony. This, coupled with the conclusions resulting from our study of the record, inevitably leads to a finding that the jury's apparent rejection of Unger's testimony was based on sheer surmise and con-

jecture. Accordingly, allowing its verdict to stand would result in manifest injustice.

## D. *WHAT LED THE JURY ASTRAY?*

We must now determine what led the jury to render a wholly unjustified verdict against Unger. Two factors produced this result: (1) the Government's total misunderstanding of the *Rem* decision, and (2) the fact that Unger was called upon to testify in 1996 concerning events that had occurred in 1984.

With respect to the first factor, as we earlier noted, the *Rem* decision led us to find irrelevant any documents defining Unger's "technical authority or titular designation." This finding was based on Judge KEARSE's clear statement in this regard which was echoed in Judge LEVAL's concurrence. (*See* page 1156, *supra*). In all the various memoranda submitted by the Government, despite many references to Judge KEARSE's opinion, this vital statement was never mentioned, let alone discussed. Due to its resulting misunderstanding of the *Rem* decision, the Government persistently cross-examined Unger as though each one of the irrelevant documents somehow refuted what he was saying.

With respect to the second factor, as the Government specifically noted, Unger signed "*thousands* of checks during 1984." Tr. at 149 (emphasis ours). The issuance of most of these checks was directed after Landau had reviewed long lists compiled either by Unger *or others* working with him. Tr. at 205–08. It was therefore inevitable that twelve years later there would be many such checks and other documents of which Unger had no present recollection. Despite this inevitability, the Government devoted a significant part of its cross-examination to persistently questioning Unger about such ancient checks and documents, eliciting a wide variety of "I don't remember" or "[t]hat's what it [the document] says" replies. For example, after handing Unger a long list of checks "sent out after [he] knew that withholding taxes were owed," the following exchange occurred (Tr. at 170):

Q: The first check, the Burger King store repayment for $606,000, what was that for?

A: I'm sorry, I don't have a specific recollection of that check.

As we listened to and observed Unger's responses to these questions, it appeared to us that his patience in dealing with such pointless and repetitive questioning emphasized his veracity. However, in retrospect we realize that the pointlessness of the questioning was obvious to us only because of our several years familiarity with the case. The jury—having no such familiarity and not really grasping the unreasonableness of being called upon after twelve years to remember *thousands* of checks and documents—was unable to comprehend that anybody could draw a check for $606,000 and not remember it for the rest of his life. Thus, the Government's apparently sincere efforts to "refresh his recollection" by continually questioning him about the details of these unremembered checks and documents, might well have persuaded the jury that Unger was either stonewalling or lying.

The impression of falsehood came into focus at the very end of the Government's recross-examination. Directing Unger's attention to his testimony that in 1984 he had not received the $100,000 salary assigned to him, the Government confronted him with, and purported to "refresh his recollection" by, what appeared to be an official Bankruptcy Court document asserting that he had actually received the full amount. Gov't Ex. 36. As we were then unaware of the RLA payroll checks which the Government supplied after the trial (*see* footnote 2, *supra*), all we could do was strike the official-looking Bankruptcy Court document on the ground that Unger had not been shown to have had any part in preparing it. This must have appeared to the jury as a highly technical and confusing ruling.

In the Government's summation the suggestions of faulty recollection became accusations of perjury. As regards the case against Unger, the Government's theme was "documents do not lie." Tr. at 716–18. The jury was not told that these purportedly truth-telling documents did nothing but establish Unger's technical authority or titular designation, and had no bearing on any question with which the jury should be concerned. In brief, what ultimately misled the jury was the Government's wholly unwarranted crescendo of suggested unreliability, asserted falsehood and ultimate accusations of perjury.

### E. SHOULD A NEW TRIAL BE ORDERED OR SHOULD FINAL JUDGMENT BE ENTERED?

In making his motion to set aside the verdict, Unger specifically abjured requesting a final judgment. We must therefore determine whether or not we should *sua sponte* grant such a judgment and bring this seemingly interminable litigation to an end. The answer to this inquiry turns on whether or not the Government has available to it any unused evidence which might support a just verdict against Unger, and if so, whether it could justify its failure to produce it at trial. We are satisfied that no such evidence exists. However, this satisfaction is not based on any thing before us, but on inference arising out of the general conduct of the parties. In the hope of developing actual evidence, we directed the Government to produce documents in its possession which might indicate whether or not various designated persons would be able to give testimony against Unger. The Government produced the documents, protesting that they were irrelevant to the question of whether or not the verdict should be set aside. The Government's position in that regard is most certainly correct. Moreover, we have concluded that the documents are not necessary for the purpose that prompted us to request them. We have therefore returned them unread. Should the Government wish to challenge our finding that it has no available unused evidence, and so advise us before the expiration of its time to move for reargument of this order, we shall ask that the documents be returned and made available to counsel. Entry of judgment would then be stayed pending determination of what, if any, heretofore unused evidence is available, and whether or not the Government has a plausible explanation for its failure to produce it at trial.

### CONCLUSION

The verdict against Unger is set aside and the Government's counter-claim is dismissed.

As we expressly determine that there is no just cause for delay, the Clerk—unless receiving contrary instruction—is directed on the forty-sixth day after entry of this order to enter judgment dismissing the Government's counter-claim and directing the IRS to pay to the plaintiff Nathan Unger the sum of $21,000 with interest from the respective times the several elements of that sum were received by it, together with any chargeable costs.

**SO ORDERED.**