**Joel I. BEELER, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Third-party Plaintiff,**

v.

**Stuart ROSS and Robert Liebmann, Third-party Defendants.**

No. 86 Civ. 8810 (JGK).

United States District Court, S.D. New York.

Aug. 18, 1995.

---

necessary information and documentation to show that [CUNY] could lawfully retain her as an employee."

William E. Murray, New York City, for plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York by Sarah Thomas, Katherine Staton, New York City, for defendant.

Raymond G. Lefler, New York City, for third-party defendant Robert Liebmann.

Stuart Ross, pro se.

### OPINION & ORDER

KOELTL, District Judge:

Plaintiff Joel I. Beeler commenced this action on November 17, 1986 to obtain a refund of a $124.28 payment he made toward a penalty assessed against him by the Internal Revenue Service ("IRS") under 26 U.S.C. § 6672 for his alleged failure to cause the payment of withheld income and social security taxes allegedly owed to the Government by Equidyne Management, Inc. ("EMI"), a company of which Beeler was an officer. The statute subjects persons who willfully fail to collect and pay over withholding taxes and are responsible for doing so to a penalty equal to the total amount of the uncollected tax. The Government has counterclaimed against Beeler for $56,285.15, allegedly the unpaid portion of the $60,773.19 penalty assessment, and has filed a third-party action against Stuart R. Ross and Robert H. Liebmann, other EMI officers, seeking to hold each of them liable for the full penalty. The taxes underlying the penalties allegedly accrued in the last three quarters of 1981 and the first quarter of 1982. Following reassignment to this Court, the case was tried in an eight day bench trial. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT:

### A. *The Equidyne Ventures:*

1. Plaintiff Beeler and third-party defendant Ross are lawyers. J.Ex. 23, p. 17; Beeler Aff. ¶ 1; Tr. 247. Third-party defendant Liebmann is a Certified Public Accountant with extensive experience in real estate. Tr. 559–61.

2. In 1977, Beeler and Ross incorporated Equidyne Corporation ("Equidyne") for the purposes of engaging in syndicated offerings to qualified investors. Initially, Equidyne offered investors interests in limited partnerships owning energy related enterprises. Most of the investment opportunities were

marketed as tax shelters. Stip.Facts 1, 2 [1]; Tr. 24, 250–52, 257; Beeler Aff. ¶ 5.

3. Beeler and Ross incorporated various corporations to acquire and transfer assets to the limited partnerships and to otherwise assist in the conduct of the Equidyne ventures. Beeler and Ross each had a fifty percent share in the equity of these entities, but profits were split sixty percent to Ross and forty percent to Beeler. Stip.Facts 3, 4, 5; Tr. *24, 257–60, 263, 949–52.

4. In 1978, Equidyne Properties, Inc. ("EPI") was formed to acquire real estate properties for Equidyne Corporation. Beeler was the President of EPI and Ross was Secretary–Treasurer. Stip.Fact 5.

5. EPI purchased, owned, and syndicated nine properties (the "Equidyne properties") through a series of limited partnerships. EPI was the general partner of each of the limited partnerships that owned a property. Stip.Fact 6; Beeler Aff. ¶ 9.

6. Prior to 1981, Equidyne Management, Inc. ("EMI") was incorporated for the purpose of managing the real estate properties syndicated by Equidyne. Stip.Fact 7; Beeler Aff. ¶ 11, Tr. 82, 275, 882, 902. EMI was wholly owned, either directly or indirectly, by Equidyne. Stip.Fact 10, Tr. 275.

7. Beeler and Ross were EMI's directors. Tr. 299–300. At the time of EMI's formation, Beeler was its president, but he ceded that role to Peter Pantelic prior to June 30, 1981. Stip.Fact 8. Ross was EMI's secretary. Tr. 94, 294–97; J.Ex. 18.

8. To assist them with the financial aspects of their ventures, in or about January, 1980, Beeler and Ross hired third-party defendant Robert Liebmann to be Financial Vice–President of EMI and the other entities involved in the Equidyne ventures. Stip. Fact 14; Liebmann Aff. ¶ 1; Beeler Aff. ¶ 12; Tr. 561–62. At the time of his hiring, Liebmann's nominal employer was Eastland Industries, Inc. Tr. 561–62. Initially, Liebmann's duties included supervising the bookkeeping staff that kept the records for the ventures, and once Steve Miller was hired as a controller for EMI, he reported to Lieb-

mann. Stip.Fact 26; Tr. 570–74, 900–01. After being hired as president of EMI, Peter Pantelic would sometimes report to Liebmann as well as to Beeler. *Id.* Liebmann was not a shareholder of EMI. Stip. Fact 27.

9. Beeler was primarily responsible for the day-to-day decisions required to manage the Equidyne properties. After becoming president of EMI, Peter Pantelic reported to Beeler. Stip.Fact 25.

10. Peter Pantelic was hired in 1981 as President of EMI. Stip.Fact 15. However, Beeler and Ross continued to make the company decisions and Liebmann continued to act as the equivalent of a senior executive officer. Tr. 798. Pantelic was never authorized to sign EMI checks. Stip.Fact 21. Generally, he reported to Beeler. Tr. 652, 910–11. He would also report to Liebmann. Stip.Fact 26, Tr. 279, 652, 753, 827, 910–11. His decisions regarding which bills to pay had to be approved by Beeler, Liebmann, or Ross. Tr. 760–61, 803–04, 1053.

11. Steve Miller was hired in 1981 as Controller of EMI and other Equidyne entities. Stip.Fact 16; Tr. 761–62, 1034. Miller reported to Liebmann, among others. Stip. Fact 26; Tr. 1035–36. Miller was fired by Liebmann at Ross' insistence in April, 1982. Tr. 162–63, 610, 1046; Beeler Aff. ¶ 27.

12. EMI's executive, management, and accounting staff was located at 950 Third Ave. in New York City. Stip.Fact 13. They handled the accounting for all of the entities related to the Equidyne properties. Beeler Aff. ¶ 13, Tr. 623–24.

13. All EMI corporate and banking records were located at the New York office. Tr. 623, 805. Beeler, Ross, and Liebmann had access to all such records from at least early 1981 to early 1982. Tr. 303, 623, 806.

14. With the exception of limited checking account records, tax returns, and some memoranda, all of EMI's corporate records have disappeared. Stip.Fact 9.

15. EMI received a management fee of 3 to 6 percent of an Equidyne property's

---

1. Facts stipulated to by the parties in the Joint Pretrial Order are indicated by "Stip.Fact" followed by the paragraph number of the stipulated fact in the order.

monthly rental income. Stip.Fact 19; J.Ex. 23, p. 35; Tr. 81, 637–38. EMI also received a substantial initial management fee when a limited partnership deal closed. Tr. 639. In the fourth quarter of 1981 alone, EMI received $100,000 in initial management fees. Tr. 641. Prior to the formation of EMI, the Equidyne properties were managed by independent, real estate management companies. Beeler Aff. ¶ 11. EMI was formed to generate additional income by bringing the property management operations "in-house." Beeler Aff. ¶ 11, Tr. 81–84, 276–77, 882. EMI received reimbursement from each of the Equidyne partnerships for actual expenses incurred by EMI on behalf of a partnership, such as payroll and utilities. Stip.Fact 18; J.Ex. 23, Ex. H; Beeler Aff. ¶ 14; Tr. 318–19, 637–38.

16. The standard management agreement between the Equidyne limited partnerships and EMI provided that EMI would employ the individuals who worked on-site at the partnership properties. Beeler Aff. ¶ 13; Tr. 625, 762–63, 804, 881–85; J.Ex. 23, p. 3 & Ex. H, p. 3.

17. On April 1, 1981, the beginning of the second quarter of 1981, EMI began issuing the payroll of all of the Equidyne properties. Stip.Fact 17; Beeler Aff. ¶ 13. EMI assumed responsibility for withholding payroll taxes as well as paying employees. Tr. 318–19. Pursuant to the management agreements between the partnerships and EMI (see, e.g., J.Ex. 23, Ex. H), EMI filed quarterly and yearly withholding tax returns (Forms 941 and 940, respectively) listing employees working at the Equidyne properties, as well as EMI employees in the New York office. J.Exs. 22, 49, 51, 63. EMI was reimbursed for its payment of the payrolls of the individual properties. Stip.Fact 18.

18. There were not rigid separations among the corporations involved in the Equidyne ventures and among other corporations that Beeler and Ross controlled. The corporations shared office space, supplies, and employees. Tr. 314–15, 755–57, 762, 796–800, 1039. Beeler, Ross, and Liebmann often met to discuss the operations of all the corporations simultaneously. Tr. 911. Beeler and Ross ordered frequent money transfers among them. Tr. 94, 140–143; 800, 1038–39. Employees were often directed to take actions as if there were only one corporate entity rather than several. Tr. 304–05; J.Exs. 2, 3, 26, 41, 50.

19. Ross, Beeler, and Liebmann received substantial compensation from the Equidyne related entities in 1981 and 1982. Liebmann received $1,000 per week. Tr. 612. Beeler received $2,000 per week in 1981 and $1,000 per week in 1982, and Ross received more. Tr. 907–910. In addition, all three were provided with corporate cars. Tr. 349–52, 612, 910.

## B. *Corporate Authority:*

20. EMI maintained three corporate checking accounts during 1981 and 1982. The accounts required at least two signatures on all checks. Stip.Fact 20.

21. Beeler and Liebmann were authorized signatories on two of the checking accounts and Ross and Liebmann were authorized signatories on the third. J.Exs. 4, 5, 18; Beeler Aff. ¶ 15; Liebmann Aff. ¶ 3; Tr. 98–100, 626. Beeler, Ross, and Liebmann each personally signed numerous checks on EMI checking accounts during the relevant tax periods. J.Exs. 70, 71. Ross personally signed several checks on the EMI account at Republic National Bank for which he may not have been an authorized signatory, but the bank did not reject these checks. Tr. 89–90, J.Exs. 12, 70; Beeler Aff. ¶ 15; Beeler Rebuttal Aff. ¶ 4; Tr. 94–95, 429–30, 548–49, 626, 707. Beeler, Ross, and Liebmann were the only authorized signatories on the EMI accounts. Neither Peter Pantelic nor Steven Miller was authorized to sign EMI checks. Stip.Fact 21. There were no restrictions in EMI's corporate banking resolutions as to the amounts authorized with particular signatures. J.Exs. 4, 5, 18, 27; Tr. 626, 713.

22. Beeler, Ross, and Liebmann each approved the conditional use of facsimile signature plates which could be used in lieu of an original signature on the corporate checks. Stip.Fact 23. The plates were used frequently. Stip.Fact 23; J.Exs. 70, 71.

23. Payment of EMI's bills required several steps. Pantelic would verify invoices for

payment and submit them to Miller who would have the bookkeeping staff prepare the checks. Stip.Fact 22. The checks would then go to the appropriate signatories for final approval before payment, and they would often go to Ross for approval even if he was not a signatory. Tr. 804, 832, 1053–54; Beeler Aff. I, ¶¶ 16, 17.

24. Beeler, Ross, and Liebmann received daily cash activity sheets showing the balances in the bank accounts of the corporations involved in the Equidyne ventures. Beeler Aff. ¶ 18; J.Ex. 31; Beeler Rebuttal Aff. ¶ 4; Tr. 139–143, 759; 834–35, 920–922; 1037–38.

25. Beeler and Ross both arranged loans on behalf of Equidyne companies. Beeler Aff ¶ 24, Tr. 926–27, Pl's Ex. 4.

26. Beeler, Ross, and Liebmann approved the salaries of EMI's employees. Tr. 906.

27. Beeler, Ross, and Liebmann shared responsibility for hiring and firing EMI personnel and other employees of the Equidyne entities, although Ross was the most likely to possess final authority. Tr. 161–63, 801, 804. Each conducted a hiring interview of Peter Pantelic and Steven Miller. Tr. 279, 293, 395–96, 613–16, 745, 819, 821–22, 903–04, 982–983, 1034–35.

### C. *The Taxes:*

28. Prior to 1981, Beeler, Ross and Liebmann were aware of EMI's duty to pay payroll taxes. Tr. 334, 646, 894–95.

29. Beeler was aware as of July, 1981 that he might be subject to criminal or civil liability for EMI's failure to pay its payroll taxes. Tr. 894–95; J.Ex. 10.

30. Beeler, Ross, and Liebmann were aware of unpaid EMI payroll taxes no later than July 1, 1981. Beeler Aff. ¶ 20; J.Exs. 10, 11; Tr. 105, 577, 580, 655–56, 896.

31. In June or July, 1981, Liebmann received notice from the IRS of EMI taxes due and took it to Beeler, telling him that he must pay the payroll taxes because he was responsible for them. Tr. 577, 580, 646. Liebmann also notified Ross of the delinquency. Tr. 646–47. Liebmann discussed the status of payroll tax payments with the book-keeping staff each time they received past due notices from the IRS. Tr. 655–56.

32. Although he asked Beeler to make sure that the payroll taxes were paid, Liebmann never asked Beeler to cosign a check to pay the payroll taxes. Tr. 653–55. While both Beeler and Liebmann blame Ross for resisting the payment of the payroll taxes, it is clear that Beeler and Liebmann had the authority to cosign checks to pay for payroll taxes but did not do so.

33. On July 1, 1981, Beeler informed Ross by memo that he had received a notice of EMI's outstanding taxes and that they must pay them or risk being held liable for one hundred percent penalties. J.Ex. 10. Beeler stated he was willing to borrow or otherwise raise money to pay the taxes, if Ross would contribute an equal amount. J.Ex. 10. Ross replied by memo that he did not have money for the taxes because he had other financial commitments. J.Ex. 11.

34. Liebmann instructed the EMI bookkeeper in July, 1981, to be sure that the quarterly tax returns were filed on time. Tr. 566–67. In October 1981, he reiterated his instruction, telling the accounting department to file the returns regardless of whether there were sufficient funds to pay the taxes. Tr. 571; J.Ex. 17. However, Liebmann was well aware that, despite the filing of the forms, the taxes were not being remitted to the Internal Revenue Service. Tr. 577, 580, 653–55.

35. After beginning to process the payroll on behalf of the Equidyne properties in April, 1981, EMI failed to remit payment of payroll taxes to the IRS when it prepared and filed its quarterly returns (IRS Form 941), although it reported the amounts withheld for the second, third, and fourth quarters of 1981 and for the first, second, and third quarters of 1982. Stip.Fact 28. The EMI 941 forms reported accrued taxes and acknowledged that EMI had made no past payments of the taxes and had sent no payment with the forms. Stip.Facts 30; J.Exs. 22, 49, 51, 63; Nussenblatt Dec. ¶¶ 13, 17. The forms for the relevant tax periods were prepared, under the direction of Liebmann and Miller, by either Rene Rodriquez or Jane Yu, EMI's bookkeepers. Stip.Fact 29.

36. Joint Exhibits 22, 49, 51, and 63 are either authentic copies of tax returns actually filed with the IRS by EMI or copies of return forms used as worksheets that reflect the same information that was reported to the IRS. The originals of the returns filed with the IRS have been destroyed pursuant to IRS document retention procedures. Tr. 1097–98. The information on the returns is corroborated by the transcript of EMI's tax account and by the transcripts of account and Certificates of Assessment and Payment for Beeler, Ross, and Liebmann. Joint Exs. 75, 76, 77, 78; Gov't Exs. AX, AY, AZ; Nussenblatt Decl. ¶¶ 13, 15, 17.

37. On or about December 28, 1981, the IRS began sending notices to EMI that certain payroll taxes were due and owing. Stip. Fact 31. EMI did not pay the payroll taxes claimed to be due. Stip.Fact 32.

38. The real estate partnerships continued to generate considerable rents every month through the end of 1982. Tr. 335–336, 638, 930–31.

39. EMI had sufficient funds to pay all payroll taxes during the relevant tax periods. Nussenblatt Dec. ¶ 18; Beeler Aff. ¶¶ 14, 35, 36; J.Exs. 33–34, 39, 68, 69; Tr. 98–100, 124–25, 403, 475–80, 570–75, 637–38.

40. Although not always involved in EMI's daily operations, Ross had the authority to direct EMI's bookkeeping department to pay EMI's payroll taxes, but he did not. Tr. 334, 336–37.

41. Based upon all the corporate records introduced at trial and my assessment of the credibility of each of the witnesses, I find that Beeler, Ross, and Liebmann each could have caused EMI to pay the withholding taxes it owed subsequent to the time at which they knew EMI was not paying trust fund taxes. While each has chosen to blame one or more of the others, each was responsible for seeing that the taxes were paid and each failed to do so.

42. Beeler, Ross, and Liebmann personally signed checks on EMI's checking accounts during the relevant tax periods, authorizing payment to employees or creditors other than the IRS, even after they knew that the payroll taxes were not being paid. Tr. 326–32, 585, 627–31, 911, 914–19, 1042–1044; J.Exs. 70, 71.

43. Beeler personally signed at least 18 EMI checks totalling more than $90,000 from July 1, 1981 through March 31, 1982, after he knew that the taxes were not being paid. J.Exs. 70, 71, 79. He signed checks paying utilities, reimbursing Pantelic for expenses, and transferring money to the account of Eastland Industries which was being used for payment of EMI's payroll. Tr. 916–920, 926. Ross personally signed at least 21 EMI checks totalling more than $25,000 from July 1, 1981 through March 31, 1982, after he knew that the taxes were not being paid. J.Exs. 70, 71. Ross personally signed payroll checks that showed that withholding taxes had been deducted from the employee's gross wages. Tr. 89, 92; J.Ex. 12. Liebmann personally signed at least 16 EMI checks totalling more than $143,000 from July 1, 1981 through March 31, 1982, after he knew that the taxes were not being paid. Tr. 647; J.Exs. 70, 71.

44. In addition, facsimile signatures of Beeler, Ross, and Liebmann, were used on many other checks during this period. J.Exs. 70, 71. In the period from July 1, 1981 through March 31, 1982, Beeler's facsimile signature was used on at least 90 checks totalling more than $250,000; Ross' facsimile signature was used on at least 30 checks totalling more than $40,000; and Liebmann's facsimile signature was used on at least 40 checks totalling more than $140,000. J.Exs. 70, 71.

45. Even when EMI checking accounts contained a balance insufficient to pay the taxes during the relevant tax periods, Beeler, Ross, and Liebmann could have transferred money from limited partnership accounts into EMI to cover the payroll taxes. Tr. 429–30, 548–49, 928–931; Beeler Rebuttal Aff. ¶ 4; Liebmann Aff. ¶ 3. Beeler and Liebmann authorized the transfer of approximately $200,000 in initial management fees out of EMI's account when they should have paid taxes. Tr. 1023.

D. **Termination of the Equidyne Ventures:**

46. Prior to February 1982, and continuing thereafter, Ross assumed greater finan-

cial control of EMI, insisting that no checks other than checks for payroll and recurring obligations could be issued without his approval. J.Ex. 37; Tr. 643.

47. However, through April, 1982, Beeler maintained some control over EMI. Tr. 975. Then, in May, 1982, Ross became more involved with authorizing payment of bills, requested job descriptions for each employee, and exercised significant control over the real estate operations as he and Beeler were negotiating the end of their partnership. Tr. 137, 321, 784; J.Exs. 52, 53, 54, 55; Pl's.Exs. 27, 52; Beeler Aff. ¶ 31.

48. In July, 1982, Ross instructed the bookkeeping department to cease paying Beeler's secretary. Beeler Aff. ¶ 38; Pl.'s Ex. 30.

49. By August 5, 1982, Ross was closely involved in the management of the Equidyne properties. Tr. 366–67, 643–44.

50. Ross eventually took over the management of EMI and the Equidyne properties. After Ross effectively took over the management, the partnerships continued to collect rents. Tr. 367. Ross decided not to pay EMI's outstanding payroll taxes, even though there was sufficient money to do so, because he decided that he could not be held personally liable for the payroll taxes. Tr. 404–06, 420–21, 540–41, 544–47. Ross told Liebmann that no one would have to pay the taxes. Tr. 847–48, 888–89.

51. Ross and Beeler dissolved their partnership effective November 1, 1982, when Beeler moved out of the Equidyne offices. Beeler Aff. ¶ 42.

52. When Beeler ceased working for the Equidyne entities in the Fall of 1982, Ross created General American Management Corporation ("GAMC") to take over EMI's management duties at the Equidyne properties. Tr. 324–25, 644; Beeler Aff. ¶ 43.

53. GAMC was a subsidiary of General American Corporation, which Ross and his family owned and which Ross controlled. Tr. 47–49; 324–25, 644–45.

54. Ross controlled GAMC and structured the management function of GAMC so that each Equidyne property filed its own payroll tax returns. Tr. 179–80, 216–17, 644–45.

55. At the time Ross discontinued EMI's operations, EMI held accounts receivable from the partnerships in the form of unreimbursed and unpaid management fees. Tr. 421–22; Beeler Aff. ¶¶ 43, 46.

56. Liebmann continued to work with Ross until February, 1983. Tr. 606, 715.

57. In March, 1983, Ross transferred $146,000 in limited partnership investment funds from the general partner of the partnerships, Equidyne Properties, to General American Properties, an affiliate of General American Corporation, rather than transferring the funds to EMI to pay the taxes. Tr. 183–88, 590–92; Beeler Aff. ¶ 47; Pl.'s Ex. 36.

### E. *The Penalties:*

58. On or about October 13, 1983, the IRS notified Beeler, Ross and Liebmann of the proposed assessment of a one hundred percent penalty in the amount of $96,781.04 pursuant to 26 U.S.C. § 6672, for the failure to collect, truthfully account for, and pay over to the IRS the EMI employees' FICA (Federal Insurance Contributions Act) and federal income tax withholdings for the second, third, and fourth quarters of 1981 and the first, second, and third quarters of 1982. Stip.Fact 33; J.Exs. 72, 73, 74.

59. On or about March 26, 1985, the IRS assessed a one hundred percent penalty in the amount of $60,773.19 against Beeler, Ross, and Liebmann, pursuant to 26 U.S.C. § 6672, for the unpaid tax liabilities of EMI for the second, third, and fourth quarters of 1981 and the first quarter of 1982. Stip.Fact 34. Liabilities for the second and third quarters of 1982 were erroneously left off the assessment. Stip.Fact 34.

60. On or about July 16, 1985, Beeler paid $124.28 toward his penalty assessment and filed a claim with the IRS for a refund of the money applied to the assessment and for an abatement of the assessment. Stip.Fact 35. On May 8, 1986 and July 24, 1986, the IRS applied amounts seized from Beeler pursuant to levy procedures, $4,300.50 and $187.54,

respectively, toward his penalty assessment. Stip.Fact 36.

## II. LIABILITY UNDER 26 U.S.C. § 6672:

■ Sections 3102(a) and 3402(a) of the Internal Revenue Code require an employer to withhold FICA and income taxes from the wages of its employees. 26 U.S.C. §§ 3102(a), 3402(a). Pursuant to § 7501(a) of the Code, "Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501(a). IRS regulations require that such trust funds be paid over to the IRS on a quarterly basis. 26 C.F.R. § 31.6011(a)–1, § 31.6011(a)–4; *see United States v. Rem,* 38 F.3d 634, 641 (2d Cir.1994). If an employer withholds trust fund taxes, but fails to pay them over to the United States, its employees are credited with payment of the taxes nonetheless and the Government must look elsewhere for their recovery. *Fiataruolo v. United States,* 8 F.3d 930, 938 (2d Cir.1993).

■ Section 6672 of Title 26 of the United States Code provides a means by which the Government may recover trust fund taxes that an employer has failed to pay over. It establishes a penalty equal to the amount of the unpaid taxes that may be imposed on those persons who are responsible for the tax delinquency. *Rem,* 38 F.3d at 642; *Fiataruolo,* 8 F.3d at 938. Section 6672 provides:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). Thus, given a valid assessment of unpaid withholding taxes, the elements of a claim under § 6672(a) for imposition of a penalty for unpaid withholding taxes are (1) that the individual be a person responsible for the collection and payment of withholding taxes, and (2) that the individual's failure to comply with the statute was willful. *See Rem,* 38 F.3d at 642; *Hochstein v. United States,* 900 F.2d 543, 546 (2d Cir. 1990). Individuals seeking to avoid liability under the statute bear the burden of proving by a preponderance of the evidence the absence of one or both of these elements. *Rem,* 38 F.3d at 643; *United States v. McCombs,* 30 F.3d 310, 318–319 (2d Cir. 1994); *Hochstein,* 900 F.2d at 546.

Courts have referred to persons required to "collect, truthfully account for, and pay over any tax" as responsible persons. *See, e.g., Rem,* 38 F.3d at 642; *Slodov v. United States,* 436 U.S. 238, 246 n. 7, 98 S.Ct. 1778, 1784 n. 7, 56 L.Ed.2d 251 (1978). A person may be a "responsible person" without being the most responsible person. *See Hochstein,* 900 F.2d at 547. An individual need not " 'have the final word as to which creditors should be paid' " as long as the person has significant control over the disbursement of funds. *Rem,* 38 F.3d at 642 (quoting *Hochstein,* 900 F.2d at 547) (quoting *Gephart v. United States,* 818 F.2d 469, 475 (6th Cir. 1987)); *Fiataruolo,* 8 F.3d at 939.

■ More than one individual may be a responsible person within the meaning of § 6672(a). *Rem,* 38 F.3d at 642. However, under long-standing administrative practice, the IRS " 'collects the amount of unpaid trust fund taxes only once, whether collected in part or in whole from each responsible person and/or corporate employer.' " *Bradley v. United States,* 936 F.2d 707, 711 (2d Cir. 1991) (quoting *In re Technical Knockout Graphics, Inc.,* 833 F.2d 797, 799 (9th Cir. 1987)); *Brown v. United States,* 591 F.2d 1136, 1142–43 (5th Cir.1979). Thus, responsible persons are to be held jointly and severally liable for the amount of any one hundred percent penalty. *Sinder v. United States,* 655 F.2d 729, 732 (6th Cir.1981); *Brown,* 591 F.2d at 1142.

■ To give effect to the revenue collection purpose of the statute, the courts have taken a "broad view" of who qualifies as a "responsible person" within the meaning of § 6672. *Rem,* 38 F.3d at 642 (quoting *Fiata-*

*ruolo,* 8 F.3d at 938); *Barnett v. IRS,* 988 F.2d 1449, 1454 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993). Responsibility under section 6672 "is a matter of status, duty and authority." *Fiataruolo,* 8 F.3d at 939 (citations omitted). Although determinations of responsibility and willfulness under § 6672 are often very fact-specific and can be made only in view of the totality of the relevant circumstances, there are several general principles to be considered. In *Rem,* the Court of Appeals summarized general principles that apply:

> [I]t is not necessary that the individual in question have the final word as to which creditors should be paid in order to be subject to liability under this section. The determinative question is whether the individual has significant control over the enterprise's finances. No single factor is dispositive in evaluating whether the individual had significant control; that determination must be made in light of the totality of the circumstances. Relevant considerations include whether the individual:
>
> > (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.
>
> Thus, though § 6672(a) is not meant to ensnare those who have merely technical authority or titular designation, the section encompasses all those connected closely enough with the business to prevent the tax default from occurring ...
>
> To be willful, conduct need not stem from an evil motive or intent to defraud, but it must amount to more than negligence. The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead. Thus, failures were willful within the meaning of § 6672(a) if they were voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government.
>
> If the responsible person had the requisite knowledge, even the fact that he would have been discharged for paying the taxes is insufficient to make the failure to pay not willful.

*Rem,* 38 F.3d at 642–43 (citations and internal quotation marks omitted). The focus of the inquiry is whether an individual has "significant control over the enterprise's finances." *Hochstein,* 900 F.2d at 547 (citations omitted).

■ An assessment of withholding taxes underlying a § 6672 penalty is entitled to a presumption of correctness. *McCombs,* 30 F.3d at 318. Therefore, the Government may prove the amount of unpaid withholding taxes by Certificates of Assessment. *United States v. McCombs–Ellison,* 826 F.Supp. 1479, 1486 (W.D.N.Y.1993), *aff'd in part, vacated in part on other grounds,* 30 F.3d 310 (2d Cir.1994). Generally, "courts will not look behind an assessment to evaluate the procedure and evidence used in making the assessment." *Id.* at 1486 (quoting *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir. 1987)). A taxpayer bears both the burdens of persuasion and production in showing that the presumption of correctness is unwarranted in a particular case. *Id.*

Under the foregoing principles, the plaintiff and each of the third-party defendants are jointly and severally liable for the one hundred percent penalty sought by the Government pursuant to § 6672(a).

## III. CONCLUSIONS OF LAW:

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1340,[2] 1345,[3]

---

**2.** Section 1340 provides in relevant part that:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue ... 28 U.S.C. § 1340.

**3.** Section 1345 provides that:

1355,[4] and 1346,[5] and 26 U.S.C. §§ 6502,[6] 7401,[7] and 7402.[8]

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1396. Beeler and Ross reside in the Southern District of New York and the liability arose in this District.

3. Due to the presumption of correctness attributed to assessments of withholding taxes, the Government is not required to produce original file-stamped EMI payroll tax returns to prove the validity of the assessment underlying the penalty sought. At trial, the Government established the accuracy of the assessments by introducing certified Certificates of Assessment and Payments and tax account transcripts for Beeler, Ross, and Liebmann.

■■■ 4. It is not disputed that EMI filed tax returns for the tax periods in question,[9] and the parties do not contest that the copies of tax returns introduced by the Government at trial are authentic EMI records.[10] There-

fore, the Court finds that these copies reflect the information reported to the IRS by EMI and are admissible to prove the contents of the original returns. Under Federal Rule of Evidence 1004, secondary evidence of documents is admissible to prove the contents of the originals if they are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith. Fed.R.Evid. 1004(1); *see, e.g., Andrew Crispo Gallery, Inc. v. Comm'r of Internal Revenue,* 16 F.3d 1336, 1342 (2d Cir.1994). The original returns filed with the IRS were not destroyed in bad faith, but pursuant to normal IRS document retention procedures. Therefore, the returns introduced into evidence are admissible as proof of the contents of the original returns.

### A. *Responsibility:*

■■■ 5. The evidence plainly establishes that Ross, Beeler, and Liebmann are each responsible persons under § 6672(a), because

---

Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits, or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress.
28 U.S.C. § 1345.

**4.** Section 1355(a) provides:
The district courts shall have original jurisdiction, exclusive of the courts of the State, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress, except matters within the jurisdiction of the Court of International Trade under Section 1582 of this title.
28 U.S.C. § 1355.

**5.** Section 1346 provides in relevant part that:
The district courts shall have original jurisdiction ... of any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.
28 U.S.C. § 1346.

**6.** Section 6502 provides in relevant part that:
Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the

proceeding begun within ten years after the assessment of the tax.
26 U.S.C. § 6502.

**7.** Section 7401 provides that:
No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced.
26 U.S.C. § 7401.

**8.** Section 7402(a) provides that:
The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of ne exeat republica, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws.
26 U.S.C. § 7402(a).

**9.** *See* Stip.Facts 28–30.

**10.** In the Joint Pretrial Order, Ross stipulated that documents he produced in discovery, including the tax returns, are authentic EMI records. Joint Pretrial Order at 3.

several indicia of their authority, viewed in light of the totality of the circumstances, demonstrate that each of them could have paid over the trust fund taxes owed to the Government by EMI. They were connected closely enough with the business to have prevented the tax default from occurring. The facts indicate that all of the relevant factors specified in *Rem* apply to Beeler, Ross, and/or Liebmann.

6. Ross, Beeler, and Liebmann were officers of EMI. Beeler and Ross were co-owners of EMI and its directors.

7. Beeler, Liebmann, and at times Ross, were active in the management of EMI's day-to-day affairs.

8. They jointly exercised the power to hire and fire employees, although Ross was more likely to have final authority.

9. They were the only signatories on EMI's bank accounts and each signed numerous checks during the tax periods for amounts totalling more than the tax delinquency.

10. The evidence showed that Ross, Beeler, and Liebmann each made decisions regarding which, when, and in what order outstanding debts or taxes would be paid. Each signed numerous checks; each was privy to the records regarding EMI's cash flows; and each was in a position within the company in which setting the corporation's financial priorities was an appropriate function.

Ross was not always closely involved with the day-to-day operations of EMI, but he issued orders instructing certain checks to be sent to him for approval before payment.

Beeler was the highest corporate officer involved in the day-to-day operations of EMI, held the title of President for some portion of the relevant time periods, and made many decisions regarding financial priorities, as reflected by the numerous checks that he signed.

Liebmann's title was Financial Vice–President and he functioned as a senior executive officer of EMI. He is a certified public accountant and was hired to assist Ross and Beeler in the financial aspects of their ventures. The accounting staff for the Equidyne entities reported to Liebmann and it was Liebmann who directed the accounting staff to file timely the quarterly tax returns even if payments were not made. His signature on numerous EMI checks demonstrates an ability to set corporate financial priorities.

11. Beeler, Ross, and Liebmann not only exercised control over the daily flow of money out of EMI, but also had check-signing authority on other Equidyne related accounts that allowed them to move money into EMI.

12. For the foregoing reasons, Beeler, Ross, and Liebmann are responsible persons under § 6672(a).

13. Regardless of the relative involvements of Beeler, Ross, and Liebmann in the preparation of tax returns and in EMI's bookkeeping functions, they are responsible persons in view of the extent of their general corporate authority. *See, e.g., Purcell v. United States,* 1 F.3d 932, 937 (9th Cir.1993) (finding an individual may be held responsible if he "had the authority required to exercise significant control over the corporation's financial affairs, regardless of whether he exercised such control in fact."); *see also, Barnett,* 988 F.2d at 1457 ("[N]ot only is it a bad business practice for a high-level company official ... to fail to monitor his company's finances, it also subjects him to being held a responsible party under § 6672."). Moreover, a "responsible" corporate officer cannot delegate his authority so as to avoid responsibility for failure to pay over withholding taxes. *Purcell,* 1 F.3d at 937 ("That an individual's day-to-day function in a given enterprise is unconnected to financial decision making or tax matters is irrelevant where that individual has the authority to pay or to order the payment of delinquent taxes."); *Denbo v. United States,* 988 F.2d 1029, 1033 (10th Cir.1993) (holding that although "it was Allred ... who controlled the day-to-day operations of the corporation and made decisions concerning the payment of creditors and disbursement of funds," Denbo remained responsible because "[h]is financial involvement in the corporation, along with his check-signing authority, gave him the effective power to see to it that taxes were paid") (citation omitted).

14. The fact that neither Beeler, Ross, nor Liebmann could sign EMI checks without obtaining a co-signature does not diminish the strength of their signing authority as an indicia of their ability to have prevented the tax default from occurring. *Thomas v. United States*, 41 F.3d 1109, 1114 (7th Cir.1994) (holding that authority to co-sign checks supported jury finding that plaintiffs were responsible persons because plaintiffs could have refused to sign and co-sign checks until the corporation paid its taxes); *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984) ("[W]here a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature ... he will generally be held 'responsible.'") (citations omitted); *Burack v. United States*, 461 F.2d 1282, 1291, 198 Ct.Cl. 855 (1972) ("Authority to cosign in effect gives one the authority to decide which creditors should be paid. Plaintiff may not have participated in the preparation of the checks, but he had the power to prevent disbursement of funds except to appropriate creditors ..."); *Carter v. United States*, 717 F.Supp. 188, 192 n. 6 (S.D.N.Y.1989) (finding that the need for a co-signor on a corporate checking account does not materially diminish the strength of check signing authority as an indicia of the ability to have prevented a tax default from occurring); *Simpson v. United States*, 664 F.Supp. 43, 48 (E.D.N.Y. 1987) (holding that if the need for two signatures on checks was a defense to responsible person status, section 6672 could be subverted by the expedient of diffuse check-signing authority); *Silberberg v. United States*, 355 F.Supp. 1163, 1166 (S.D.N.Y.1973) (quoting *Burack*). A person may be a responsible person without having complete control over a corporation's financial affairs or even having the greatest control. *Denbo*, 988 F.2d at 1033 (" '[S]ection 6672 does not confine liability for the unpaid taxes only to the single officer with the greatest or the closest control or authority over corporate affairs.'") (quoting *Gephart v. United States*, 818 F.2d 469, 476 (6th Cir.1987)).

15. Ross argues that he had no obligation to pay the taxes at issue once he acquired complete control of EMI subsequent to the time the tax liabilities accrued.

In *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), the Supreme Court held that:

> [A] "responsible person" under § 6672 may violate the "pay over" requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501, but that § 7501 does not impress a trust on after-acquired funds, and that the responsible person consequently does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

*Id.* at 259–60, 98 S.Ct. at 1791 (footnote omitted). However, at the time Ross assumed sole control of EMI, there were funds with which to satisfy its prior tax obligations and thus Ross had a duty to do so. In any case, even if there were no such funds, Ross would not be absolved of liability under *Slodov*, because he was a responsible person prior to the time at which he acquired complete control of EMI and is a responsible person because he could have and should have assured the payment of taxes before he ever acquired complete control of EMI. After he acquired complete control, he also had a duty to use any after-acquired funds to pay the taxes. *Purcell*, 1 F.3d at 938 (holding that the use of after-acquired funds to pay commercial debts by the same persons who were responsible for the failure to collect and pay the withholding taxes in the first instance gives rise to liability under § 6672); *Kinnie v. United States*, 994 F.2d 279 (6th Cir.1993) (holding that a responsible person has a duty to use after-acquired funds to pay tax liabilities incurred at a time when he or she was a responsible person, even if the liabilities were unknown when incurred); *Barnett*, 988 F.2d at 1458 (" '[I]n the case of individuals who are responsible persons both before and after withholding tax liability accrues ... there is a duty to use unencum-

bered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so when there is knowledge of the liability ... constitutes willfulness.' ") (quoting *Mazo v. United States,* 591 F.2d 1151, 1157 (5th Cir.), *cert. denied sub nom. Lattimore v. United States,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979)); *Denbo,* 988 F.2d at 1035 (same).

**B.** *Willfulness:*

■ 16. In *Rem,* the Court of Appeals instructed that:

> The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead. Thus, failures were willful within the meaning of § 6672(a) if they were voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government.

*Rem,* 38 F.3d at 643 (citations and internal quotation marks omitted); *see also, McCombs,* 30 F.3d at 320; *Hochstein,* 900 F.2d at 548. Willful conduct can be demonstrated by a grossly negligent or reckless disregard of obvious or known risks of whether taxes were being paid. *See McCombs,* 30 F.3d at 320; *United States v. Running,* 7 F.3d 1293, 1299 (7th Cir.1993); *Denbo,* 988 F.2d at 1033. Willfulness is also established by a "failure to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the Government." *Rem,* 38 F.3d at 643 (quoting *Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975)); *see also McCombs,* 30 F.3d at 320; *Running,* 7 F.3d at 1299.

■ 17. A failure to pay is willful even if a responsible person did not know contemporaneously of the corporation's nonpayment, "if, when he became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes." *Rem,* 38 F.3d at 643.

18. Encumbered funds, which need not be used to pay the tax liability, are only those funds that are "subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS." *Barnett,* 988 F.2d at 1458 (quoting *Honey v. United States,* 963 F.2d 1083, 1090 (8th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 676, 121 L.Ed.2d 598).

■ 19. A responsible person is under a duty to use after-acquired funds to pay the taxes if he was a responsible person at the time the delinquency accrued, even if he did not learn of the tax delinquency until later. *See supra,* Conclusions of Law ¶ 15.

■ 20. Under these standards, Beeler's, Ross's, and Liebmann's failures to pay over the withholding taxes were clearly willful.

21. Beeler, Ross, and Liebmann each knew no later than July 1, 1981 that EMI's withholding taxes were not being paid over to the IRS and that they were continuing to pay other creditors. Each of them chose to continue to pay other creditors, to continue to receive the personal benefits of EMI, and to fail to cause the unpaid taxes to be paid. These facts clearly demonstrated the element of willfulness.

■ 22. Indeed, even if Beeler, Ross, and Liebmann had not known that EMI's trust fund taxes were not being paid over, which they plainly did, they would nonetheless have willfully failed to pay them, because they acted with reckless disregard. They clearly ought to have known that there was a grave risk that withholding taxes were not being paid and, being experienced business men at the helm of the company, they were in a position to find out for certain very easily. *See Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987) ("[W]e hold that the 'responsible person' is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.") (cited with approval in *McCombs,* 30 F.3d at 320).

23. Beeler and Liebmann allege that Ross was unwilling to pay the delinquent taxes and that he had given instructions that taxes were not to be deemed recurring obligations and were not to be paid without his approval. Tr. 650–51. Even if Ross had ordered Beeler and Liebmann not to pay the taxes, this would be no defense. *Greenberg v. United States,* 46 F.3d 239, 244 (3d Cir.1994) (" 'Instructions from a superior not to pay taxes do not … take a person otherwise responsible under section 6672(a) out of that category.' ") (quoting *Brounstein v. United States,* 979 F.2d 952, 955 (3d Cir. 1992); *Rem,* 38 F.3d at 643; *Purcell,* 1 F.3d at 937; *Thibodeau v. United States,* 828 F.2d 1499, 1504 (11th Cir.1987); *Gephart v. United States,* 818 F.2d 469, 475 (6th Cir.1987) ("[I]t is generally held that one who is a responsible person follows the directions of a superior not to pay withholding taxes to the government at his peril."); *Roth v. United States,* 779 F.2d 1567, 1572 (11th Cir.1986) ("Roth once having become an 'otherwise responsible person' to pay over the taxes became obligated by statute to pay these funds to the Internal Revenue Service."). Indeed, Beeler and Liebmann had check signing authority and could have caused checks to be written. They chose not to and to continue to proceed with full knowledge that the taxes were not being paid.

24. Liebmann claimed that he would have lost his job if he had attempted to pay the taxes. Tr. 650–51. If a responsible person has the knowledge that taxes are not being paid and that other creditors are being paid, even the fact that he or she would have been discharged for paying the taxes is insufficient to make the failure to pay not willful. *Rem,* 38 F.3d at 643; *Greenberg,* 46 F.3d at 244; *Running,* 7 F.3d at 1298; *Hochstein,* 900 F.2d at 549; *Thibodeau,* 828 F.2d at 1504; *Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983). Here, Liebmann chose to continue to sign checks and to receive the benefits of his senior position, but not to pay the taxes. He plainly acted willfully.

25. Neither would it be a defense if there was a business necessity to pay other creditors before the Government in order for EMI or the Equidyne partnerships to remain in business. *See Greenberg,* 46 F.3d at 244; *Hochstein,* 900 F.2d at 547–48; *Thibodeau,* 828 F.2d at 1506 ("The taxpayer argues that the checks he signed were necessary to keep the corporation operating as a going concern, but the government cannot be made an unwilling partner in a business experiencing financial difficulties."); *Mazo v. United States,* 591 F.2d 1151, 1157 (5th Cir.), *cert. denied sub nom. Lattimore v. United States,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979); *Hochstein v. United States,* 713 F.Supp. 119, 123 (S.D.N.Y.1989) (cited with approval at 900 F.2d at 547), *vacated,* 900 F.2d 543 (2d Cir.1990); *Simpson,* 664 F.Supp. at 46–47 (quoting *Schwinger v. United States,* 652 F.Supp. 464, 468 (E.D.N.Y. 1987)).

26. Nor is it a defense if a responsible person does not pay over withholding taxes on the basis of a belief that future revenues would be sufficient to cover the liability. *Denbo,* 988 F.2d at 1033–34 (an officer "cannot escape liability by claiming that he relied on the assurances of others") (citation omitted). *Roth,* 779 F.2d 1567 (holding that reliance on a corporate president's statement that he would pay the taxes as soon as a real estate deal closed does not exempt vice president from section 6672 liability). Similarly, no defense is presented by Beeler's claim that he specifically loaned funds for payment of the taxes and expected to pay them, but that the funds were diverted by Ross. Beeler knew that the funds were not used to pay the taxes, that the taxes remained unpaid, and, yet, he did not cause them to be paid either before or after he obtained the loan.

27. Although Beeler, Ross, and Liebmann each needed a co-signer in order to sign a check to pay over the taxes, their failures to pay over the taxes would be willful even if they could prove that the other two refused to sign a check for payment, because each of them continued to sign checks paying other creditors after being aware that the

Government was not being paid. *See* Findings of Fact, *supra* ¶¶ 42–44.

28. Beeler, Ross, and Liebmann were responsible persons who willfully failed to pay over the taxes at issue in this litigation. Each was aware that the taxes were not being paid and that other creditors were being paid. Each has tried to blame the others for the default, but, in fact, each of them is responsible for willfully failing to cause the taxes to be paid.

## IV. CONCLUSION:

For the foregoing reasons, the Complaint is dismissed with prejudice. The Clerk is directed to enter judgment on the Government's counterclaim against Beeler and on its third party complaint against Ross and Liebmann for their failure to cause payment of EMI's trust fund taxes accrued in the second, third, and fourth quarters of 1981 and in the first quarter of 1982.

The parties are directed to submit proposed judgments and supporting memoranda and calculations in support of the proposed judgments by August 25, 1995. The memoranda should discuss the appropriate amount of the judgment to be entered against the plaintiff and each of the third party defendants in view of the joint and several nature of the judgments and the three prior payments made by Beeler, as well as the proper amount of interest and how such interest was calculated. The parties may submit any responses to submissions by other parties by August 30, 1995.

**SO ORDERED.**